## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN – SOUTHEASTERN DIVISION

LADONNA CRUTCHFIELD,　　　　　　　　　　Hon. Brandy R. McMillon
　　Plaintiff,　　　　　　　　　　　　　　　　Case No.: 25-cv-10514

- vs -

CITY OF DETROIT, *et al*,
　　Defendants.
_____/

| LAW OFFICES OF IVAN L. LAND, P.C., | CITY OF DETROIT LAW DEPARTMENT |
|---|---|
| Ivan L. Land Sr. (P65879) | Gregory B. Paddison (P75963) |
| Attorney for Plaintiff | Attorney for Defendants |
| 25900 Greenfield, Rd., Ste. 210 | Coleman A. Young Municipal Center |
| Oak Park, MI 48237 | 2 Woodward Avenue, Suite 500 |
| (248) 968-4545 | Detroit, MI 48226 |
| Ill4law@aol.com | (313) 237-0435 |
| | paddisong@detroitmi.gov |

_____/

### JOINT RULE 26 (F) DISCOVERY PLAN

**NOW COME** the parties, by and through their respective counsel, and in accordance with the Court's "Order to Attend Telephonic Scheduling Conference and Notice of Requirements for Submission of Discovery Plan" (ECF No.: 23), submit the following Joint Discovery Plan:

The Telephonic Conference is scheduled to occur on July 25, 2025, at 11:00 a.m. Appearing for the parties as counsel will be:

Plaintiff's Counsel:　　Ivan L. Land Sr. (P65879)
Defense Counsel:　　　Gregory B. Paddison (P75963)

**1. Related Cases:** None.

2. **<u>Jurisdiction</u>:** Jurisdiction is proper under 28 USC § 1331. Plaintiff brings claims pursuant to 42 USC § 1983 for alleged violations the Fourth and Fourteenth Amendments, as well as supplemental state law claims under 28 USC § 1367. Venue is proper under 28 USC § 1391(b) as all events giving rise to the complaint occurred in the Eastern District of Michigan and all Defendants reside or are located within the District.

3. **<u>Factual Summary</u>:**

**Plaintiff:** On January 23, 2024, LaDonna Crutchfield, a 36-year-old mother of three and guardian to her niece Brieal, was inside her Detroit home—where she had lived for twelve years—reading to her five-year-old daughter before preparing for her second job. At approximately 2:08 PM, Crutchfield was startled by a loud knock at her front door. Her niece Brieal looked out and observed six uniformed Detroit Police Officers standing outside the home. When Brieal asked why they were there, officers informed her they were looking for LaDonna Crutchfield.

Brieal retrieved Ms. Crutchfield from her bedroom. When Ms. Crutchfield opened the door, barefoot and confused, she was immediately questioned by officers as to her identity. Upon confirming that she was in fact LaDonna Crutchfield, Officer Anthony Williams demanded she step outside. Despite repeatedly asking why, Ms. Crutchfield was given no reason. Eventually, Officer Dorian Hardy falsely informed her that she had failed to appear in court and that there was a warrant for her arrest. This was untrue—no such warrant existed.

Still unaware of the nature of the accusation and in clear distress, Ms. Crutchfield was patted down in front of her family and neighbors by a female officer identified as Jane Doe. Officer Williams insisted she be handcuffed from behind despite her protest that she had asthma, and she nearly fell while being escorted down the street. She was loaded into a police vehicle in Crocs and taken away from her children, who were left crying and terrified.

While en route to the Detroit Detention Center (DDC), Officer Williams contacted Detective Marc Thompson to inform him that Ms. Crutchfield was in custody. Officer Joshua Holder entered information into the police car computer, which allowed Ms. Crutchfield to see for the first time that she was being charged with "assault with intent to murder." This was the first time she learned the nature of the allegation.

Upon arrival at the DDC, she was booked and then interviewed by Detective Thompson. During the interrogation, Detective Thompson showed her several still images of a Black, heavy-set woman wearing a bonnet, who was allegedly seen on surveillance footage. Ms. Crutchfield immediately denied being the person in the photos, stating that she does not wear bonnets. Detective Thompson remarked, "You got to admit that looks like you," to which Ms. Crutchfield replied, "Why? Because I'm fat and Black like her?"

Detective Thompson eventually admitted that he did not believe she was the woman involved in the incident. Officer Careema Yopp, present in the interview, agreed. Detective Thompson told Ms. Crutchfield that he would return to his office immediately to process paperwork for her release and stated that, if necessary, he would come back the next day to personally drive her home. Despite this acknowledgment of her innocence, Ms. Crutchfield remained in custody for several more hours.

She was told she would only be released if she submitted to fingerprinting and provided a DNA swab, which she did—despite her innocence—out of fear of being held overnight and missing work. She was released around 8:05 PM and picked up by her mother. Her children, traumatized by her sudden disappearance and arrest, were still in shock.

Despite having just endured the emotional trauma of a mistaken felony arrest, Ms. Crutchfield left for her second job that night to avoid losing her employment. She cried during her shift and struggled to perform her duties assisting mentally challenged adults. The next morning, still shaken, she returned to the police station demanding documentation that she had been cleared. Detective Thompson apologized and explained that his sergeant agreed she should never have been arrested. He provided her a signed letter formally stating that she was not the person involved in the criminal investigation.

This incident deeply affected Ms. Crutchfield and her family. She was falsely arrested based on an unverified facial recognition match. The arrest occurred in front of her children and niece, and despite obvious discrepancies between her and the actual suspect—including significant differences in weight and appearance—the arresting officers never independently verified the warrant or the identification before depriving her of her liberty. Ms. Crutchfield now lives with the fear and humiliation of being mistaken for a violent criminal, and the emotional damage to her and her children is ongoing.

**Defendants:** On December 28, 2023, Detroit Police ("DPD") Officers responded to 14409 Linhurst for an attempted homicide. Preliminary investigation revealed that the assailant was a heavy-set African-American woman known only as "Truth" or "Chew," had become intoxicated and shot her significant other in the head with a semi-automatic handgun, before fleeing the scene with a young child, in what witnesses described as a beige sedan, while providing a partial plate number. By cross-referencing witness statements with surveillance video showing the license plate of the assailant's vehicle, Investigating Officers determined that the vehicle was registered to a Mr. Lenn Porterico at an address on the east side of Detroit.

Knowing that the suspect was a female, Officers then ran an inquiry for females linked to Mr. Porterico's address and uncovered the name "Sheila Lloyd" a/k/a "Sheila Crutchfield" (collectively, "Sheila"). An inquiry for Sheila then revealed that she had a second registered address of 11343 Warwick Street, while also locating Sheila's Secretary of State photograph.

By comparing images of the female suspect from surveillance cameras to Sheila's Secretary of State photograph, Officers were quickly able to exclude Sheila as a possible suspect. However, also registered to the 11343 Warwick Street address was Plaintiff, LaDonna Crutchfield ("Ms. Crutchfield"). An inquiry into Ms. Crutchfield revealed that she matched the physical description of the suspect and also revealed that she had children matching the estimated age of the child that was with the female suspect at the time of the shooting.

Coupled with these considerations and after comparing Ms. Crutchfield's Secretary of State photograph to images of the shooting suspect captured by surveillance cameras, Investigating Officers identified Ms. Crutchfield as a suspect or "person of interest" and believing that probable cause for her arrest existed, requested that the Fugitive Apprehension Services Team ("FAST") apprehend her for an interrogation before finalizing a Warrant Request to the Wayne County Prosecutor's Office.[1]

On January 23, 2024, FAST Officers visited Ms. Crutchfield's home and falsely told her that there was a warrant for her arrest for missing a court date and that she needed to come with them to the Detroit Detention Center ("DDC").[2] Although confused

---

[1] FAST Officers play no role in the underlying criminal investigation.

[2] FAST Officers occasionally use the tactic of misrepresenting *why* a suspect is required to come with them because suspects have been shown to be less likely to flee or resist arrest if they believe that law enforcement's interest in them is related

about why there was a warrant, Ms. Crutchfield voluntarily complied and accompanied the officers away from her home before being handcuffed and transported to the DDC.

Body-worn camera video of the arrest demonstrates that the FAST Officers were highly professional in their interactions with Ms. Crutchfield, moving her away from the house and out of sight of her children when they handcuffed her, speaking politely and respectfully throughout their interactions, and assisting Ms. Crutchfield in walking to the police vehicle to ensure that she did not slip on snow or ice.

Roughly forty (40) minutes after FAST Officers had arrived at her home, Ms. Crutchfield was booked at the DDC. Approximately two (2) hours after being booked, the Officer in Charge of the Investigation, Det. Marc Thompson ("Det. Thompson") arrived at the DDC to question Ms. Crutchfield. However, very quickly during their discussion, Det. Thompson realized that Ms. Crutchfield was not the suspect they were looking for and requested that she be released as soon as possible. At 8:05 p.m. nearly six (6) hours after the FAST Team had taken her into custody, Ms. Crutchfield was released from the DDC.

As with the FAST Officers and to Det. Thompson's credit, records reveal that prior to Ms. Crutchfield's release: i) he informed her that he would personally drive her home from the DDC if she could not get a ride; ii) told her that she could meet him or that he would personally drive her to the 3rd Precinct the following day to have her fingerprints cleared from the system; and iii) provided her with documentation to give to her employers or any inquiring individuals or entities evidencing her noninvolvement in the underlying criminal events.

**4. Legal Issues (Claims & Defenses):**

**Claims:**

    a. **False Arrest & Imprisonment (State & Federal)**

- False Arrest and Imprisonment: To prove false arrest under Federal Law, a plaintiff must show: 1). Defendant arrested Plaintiff. 2. Defendant did not have probable cause to arrest Plaintiff. 3. Defendant acted under color of law.

---

to minor issues (*i.e.*, traffic offense) rather than far more serious offenses (*i.e.*, assault with intent to murder).

- o Pursuant to Michigan Law, a False arrest or imprisonment is: 1) an arrest or imprisonment; 2) of a person; and 3) by Defendant without probable cause.

b. **Assault and Battery (State)**

- o To establish a claim for assault and battery under Michigan law, a plaintiff must show:

    1. that the defendant intentionally committed an act that caused the plaintiff to reasonably apprehend an immediate harmful or offensive contact (assault); and

    2. that the defendant willfully and intentionally made harmful or offensive contact with the plaintiff's person without consent or legal justification (battery).

c. **False Light (State)**

- o To prove a claim of false light, a plaintiff must show: 1) the defendant broadcast or publicized facts about the plaintiff; 2) the facts were false or placed the plaintiff in a misleading light; 3) the publicity would be highly offensive to a reasonable person, and; 4) the defendant acted with knowledge or reckless disregard of the falsity of the publicized information.

d. **Monell (Municipal Liability under 42 USC § 1983)**

- o Whether the City of Detroit had: 1) an official policy or custom; 2) created or maintained by the City; 3) which caused the alleged constitutional injury to Plaintiff.

e. **Elliott-Larsen Civil Rights Act (MCL § 37.2301 *et seq.*)**

- o Was Plaintiff denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status?

 **f. Failure to Intervene (Federal)**

  o Whether officers: 1) observed the violation of Plaintiff's constitutional rights; 2) had an opportunity to prevent it; and 3) failed to intervene to stop the unlawful arrest and detention.

 **g. Intentional Infliction of Emotional Distress (State)**

  o Whether Defendant Officers engaged in: 1) extreme and outrageous conduct; 2) that was intentional or reckless; 3) which caused Plaintiff to suffer; 4) severe emotional distress.

**Defenses:**

 **a. Probable Cause**

  o Probable cause is a "fluid concept turning on the assessment of probabilities in particular contexts not readily, or even usefully, reduced to a neat set of legal rules. The process does not deal with certainties. But with probabilities. Before the law of probabilities was articulated, practical people formulated commonsense conclusions about human behavior; jurors are permitted to do the same – and so are law enforcement officers. Thus, in determining whether probable cause exists, the trial court must look to the totality of the circumstances and view the facts as a whole and in a practical manner."

 **a. Governmental Immunity (State Law) [MCL § 691.1407(1)]**

  o "Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function."

 **b. Qualified Immunity (State Law) [MCL § 691.1407(2)]**

  o "Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage

to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met: a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority; b) The governmental agency is engaged in the exercise or discharge of a governmental function; and c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage."

  c. **Qualified Immunity (42 USC § 1983)**

    o "Qualified immunity protects public officials from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In other words, government officials performing discretionary functions are shielded from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."

5. **Amendments to the Pleadings**: Plaintiff does anticipate amendments to the pleadings.

6. **Discovery**: The parties request six (6) months of fact discovery and propose the following discovery plan:

| Event/Deadline | Proposed Date |
|---|---|
| Fed. R. Civ. P. 26(a)(1) Initial Disclosures | August 22, 2025 |
| Amendment of Pleadings | October 24, 2025 |
| Interim Status Conference | TBD (November of 2025) |
| Lay and Expert Witness Lists | December 5, 2025 |
| Fact Discovery Cutoff | January 9, 2026 |
| Expert Witness Disclosures/Report by Plaintiff | February 6, 2026 |
| Expert Witness Disclosures/Report by Defendant | March 6, 2026 |
| Expert Discovery Cutoff | April 10, 2026 |
| Dispositive Motions | May 15, 2026 |
| Challenges to Experts | June 12, 2026 |
| Motions *in Limine* | July 17, 2026 |
| Final Pretrial Conference | TBD |

| Jury Trial | TBD |
|---|---|

**Joint Discovery Summary:** The discovery process will satisfy the proportionality requirements of Fed. R. Civ. P. 26(b)(1) by pursuing only the discovery that is truly necessary to resolve the case. This includes limiting discovery surrounding Plaintiff's allegations to the dates/times and individuals specifically identified in the Complaint. The most important subjects of the litigation include the Plaintiff's actions and Defendants' responses.

The Parties agree to the presumptive limits for interrogatories (25 per side) per individual party to balance the costs of discovery with the amount at stake in litigation.

The Parties anticipate that the presumptive federal limit of 10 depositions per side under Fed. R. Civ. P. 30 is sufficient in this case.

The Parties anticipate that the duration limits set for in Fed. R. Civ. P. 30(d) will be sufficient to fairly examine Plaintiff's claims and Defendants' defenses.

The Parties reserve the right to seek relief from such limitations to the extent necessary, but the Parties agree to work in good faith together prior to requiring the Court's intervention.

There is no need for changes in the timing, form or requirement for the disclosures under Rule 26(a)(1), but the Parties have not discussed exchanging initial disclosures at this time.

The Parties agree to exchange privilege logs if privilege issues arise. Anticipating the need for a reasonable protective order for Plaintiff's medical records, Defendants' sensitive personnel information, Defendant's proprietary/confidential business and/or operational information, as well as any other information the Parties identify as needing protection, the Parties will commence the process of developing such an order if necessary. Counsel will work in good faith to agree upon the terms. If unable to agree upon the appropriate terms, either party may move for a protective order as provided in the Federal Rules of Civil Procedure.

**Plaintiff's Discovery Summary:**

**Plaintiff seeks to discover:**

- Body-worn camera footage from all officers involved in the arrest, including Officer Anthony Williams, Officer Dorian Hardy, and Officer Jane Doe.

- Surveillance footage from the street and neighborhood during the time of arrest (if available).

- Any audio or video recordings from inside the Detroit Detention Center, including the interview between Plaintiff and Detective Marc Thompson and Officer Careema Yopp.

- Any and all videos from the incident when the shooting happened that is the subject of this civil suit.

- Unredacted videos and documentation received from the City of Detroit as result of the Freedom of Information Act request.

- Any and all information on the suspect that was arrested and convicted of the shooting involved in this matter.

- Documentation regarding the facial recognition software used to identify Plaintiff, including:

    o All underlying facial recognition data;

    o The original image submitted for matching;

    o The complete list of possible matches returned;

    o Internal DPD guidelines, policies, or training related to use of facial recognition.

- Any internal communications, notes, or reports prepared by the Defendant Officers or the City of Detroit related to Plaintiff's arrest, detention, and clearance.

- Any statements made by other witnesses, officers, or supervisors regarding the decision to arrest or clear Plaintiff.

- Disciplinary history, internal complaints, or prior incidents involving the named officers, particularly related to false arrests or use of force.

- Any documents or internal memoranda regarding misidentification incidents or DPD policy on mistaken identity arrests.

- Detroit Police Department policies and training materials related to:

    o Arrests without warrants;

    o Procedures when facial recognition is involved;

    o Duties to confirm probable cause before arrest;

    o Duty to intervene.

- Communications between DPD personnel and the Wayne County Prosecutor's Office concerning the decision to arrest or release Plaintiff.

**Plaintiff plans to depose:**

- All arresting officers: Marc Thompson, Anthony Williams, Dorian Hardy, Jeremy Morrow, Joshua Holder, Matthew McKinney, Jane Doe, and Police Chief Todd Bettison.

- Officer Careema Yopp, present during Plaintiff's interview.

- Any officer(s) responsible for reviewing or approving the use of facial recognition in this case.

- Supervisors or command staff who reviewed Plaintiff's case or authorized her release.

- DDC staff involved in Plaintiff's booking, fingerprinting, DNA collection, and release.

- Expert witnesses in police practices and facial recognition reliability.

- Plaintiff's healthcare providers or counselors (as needed) regarding damages.

**Defendants' Discovery Summary:** Defendants seek discovery relating to Plaintiff's claims and alleged damages. Specifically, Defendants intend to pursue the following discovery:

- Production and identification of all social media accounts used by Plaintiff and production of all content loaded onto any identified social media platform, including but not limited to Facebook, Twitter, and YouTube, relevant to the claims and allegations identified in this lawsuit, and to produce any other additional photographs and videos (outside of content posted to social media accounts), text messages, and emails relevant to the claims and allegations identified in this lawsuit; and

- Written discovery, including interrogatories and the production of any relevant documents, records (including medical records), financial documents related to Plaintiff or other materials Plaintiff has substantiating her allegations and damages alleged in his Complaint that were not otherwise provided.

Defendants intend to depose the following:

- Plaintiff;

- Plaintiff's healthcare providers;

- Plaintiff's identified expert witnesses;

- All key witnesses identified during discovery; and

- Other depositions, which may become necessary depending on Plaintiff's testimony and the information developed during discovery;

Expert witness reports regarding damages, including economic and noneconomic damages, as well as medical and mental health experts; and

Other discovery as is warranted by progression of this case.

7. **Electronic Discovery:** The Parties do not anticipate any disputes regarding the format of documents that will be produced. Once written discovery is served, the

Parties will continue to meet and confer regarding the development of protocol for discovery of electronically stored information and will consult the guidelines laid out in the Eastern District of Michigan's Model Order Relating to the Discovery of Electronically Stored Information.

It is anticipated that each side will request that the other preserve all electronically stored information that may be relevant to the case. What is considered relevant will be identified by reasonable and targeted search parameters as described below. The Parties agree that production of ESI must satisfy Rule 26(b)(2)(B). Requests for ESI and related responses will be reasonably targeted, clear, and as explicit as practicable. To manage the cost of ESI discovery, the Parties will cooperate with each other to identify reasonable and targeted search parameters, i.e. custodians and search terms, reasonably calculated to lead to the discovery of admissible evidence.

Electronic discovery materials will be produced in the most cost effective and/or time efficient manner, which will typically be electronically in its native format to the extent such materials can be produced in their native format. If the electronically stored information is not reasonably useable or obtainable in its native format and/or an objection is made to the format requested, then the Parties will confer in an attempt to determine a mutually convenient format.

Should a dispute as to the creation date of electronically stored documents arise, the Parties reserve the right to obtain that document in its native form (with metadata if produced in PDF or other non-native format originally).

8. **Settlement:**   Plaintiff does not wish to participate in mediation.
   Defendants are willing to participate in non-binding mediation.

9. **Consent:** The parties do not oppose to having a United States Magistrate Judge conduct any and all further proceedings in the case, except for trial and to order the entry of final judgment.

10. **Trial:** The case will be tried by a jury. Counsel estimates the trial will last approximately five (5) days total, allocated as follows:

    Two (2) days for Plaintiff's case; and
    Three (3) days for Defendants' case.

**11. Miscellaneous:** Plaintiff is requesting the name of the female officer who searched Plaintiff named Jane Doe in the complaint.

Respectfully Submitted,

/s/ <u>Ivan L. Land Sr.</u>               /s/ <u>Gregory B. Paddison</u>
     Ivan L. Land Sr. (P65879)           Gregory B. Paddison (P75963)
     Attorney for Plaintiff                 Attorney for Defendants

Dated: July 16, 2025