## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION


LaDONNA CRUTCHFIELD,
    an individual,                    Case No. 2:25-cv-10514-BRM-DRG
        Plaintiff,                Hon. Brandy R. McMillion

V

CITY OF DETROIT
a municipal corporation,            **SECOND AMENDED**
                                 **VERIFIED COMPLAINT**
MARC THOMPSON,              **AND JURY DEMAND**
City of Detroit Police Detective,
Individually, and

ANTHONY WILLIAMS,
City of Detroit Police Officer,
Individually, and

DORIAN HARDY,
City of Detroit Police Officer,
Individually, and

JEREMY MORROW,
City of Detroit Police Officer,
Individually, and

JOSHUA HOLDER,
City of Detroit Police Officer,
Individually, and

MATTHEW MCKINNEY
City of Detroit Police Officer,
Individually, and

SABRINA CARRION,

City of Detroit Police Officer,
Individually.

CAREEMA YOPP,
City of Detroit Police Officer,
Individually.


       Defendants.

---

## SECOND AMENDED VERIFIED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, LaDonna Crutchfield, pursuant to Joint Rule 26(F) Discovery Plan (ECF No. 28) files the following for her Second Amended Verified Complaint.

## <u>INTRODUCTION</u>

1. The integrity of law enforcement depends on honesty, accountability, and respect for constitutional protections. When officers disregard these principles, public trust erodes and innocent citizens suffer.

2. The Detroit Police Department has a long and documented history of unconstitutional practices. In 2003, following a two-and-a-half-year federal investigation, the United States Department of Justice imposed a consent decree on the Detroit Police to remedy systemic misconduct, including a pattern of unlawful arrests and detentions.

3.     In 2014, after more than a decade of oversight, the Department of Justice declared Detroit Police in compliance and ended the consent decree.

4.     Eleven years later, the Department has regressed to the same unconstitutional conduct that brought federal oversight in the first place. Detroit residents once again face unlawful seizures, fabricated claims of warrants, and investigations conducted with reckless disregard for the truth.

5.     Plaintiff LaDonna Crutchfield's case exemplifies this regression. Ms. Crutchfield, a lifelong Detroit resident, was a 36-year-old single mother of three who also cares for her young niece after her niece's mother (Ms. Crutchfield's sister) died from COVID-19. Ms. Crutchfield works two jobs to provide for her family.

6.     On January 23, 2024, while Plaintiff was home reading to her five-year-old daughter, six Detroit Police Officers came to her home and demanded that she step outside. In front of her children and her niece, one of the officers told Ms. Crutchfield there was a warrant for her arrest - no such warrant existed.

7.     Officers in this matter ignored critical exculpatory evidence that distinguished Ms. Crutchfield from the actual suspect. Both the victim and a key eyewitness were shown photo lineups and affirmatively stated that Ms. Crutchfield was not the suspect. Still, police disregarded their statements.

8.      The officers also failed to fully investigate the suspect's car, nickname, history of prior violent incidents, and long-term relationship with a victim in another related case.

9.      Furthermore, the officers neglected to test a vodka bottle left at the crime scene by the suspect. This evidence was not tested until nearly a year later, despite its obvious evidentiary value.

10.     Ms. Crutchfield was handcuffed on her front porch, searched in view of her neighbors, and paraded down the street in humiliation. She was then transported to jail and booked on charges of assault with intent to murder.

11.     During her detention, she was shown photographs of the actual suspect, a different woman altogether, yet officers pressed her to admit resemblance. She was forced to provide fingerprints, thumbprints, and a DNA swab despite her innocence.

12.     Though she was ultimately released, the damage had already been done. Ms. Crutchfield's children were traumatized by seeing their mother taken away in handcuffs, her employment was put at risk, and she was left terrified of being wrongfully arrested again.

13.     Ten months later, the vodka bottle recovered from the scene was finally tested. DNA results conclusively identified the actual suspect—the same woman

with a known history of violence and a decade-long relationship with a victim in another matter that the Detroit Police were already investigating.

14.  The failure to investigate the evidence in a timely manner had deadly consequences. The actual suspect remained at large and went on to kill two additional people after Ms. Crutchfield's wrongful arrest.

15.  This lawsuit seeks to hold the City of Detroit and the responsible officers accountable for violating Ms. Crutchfield's constitutional rights. It further underscores that Detroit Police have once again reverted to patterns of unlawful arrest that place every citizen at risk and call for systemic reform.

## JURISDICTION AND VENUE

16.  This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

17.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, §1343, and §1367.

18.  Venue is proper under 28 U.S.C. §1391(b), as the events giving rise to the claims asserted in this complaint occurred within this district.

## PARTIES

19.  Plaintiff, LaDONNA CRUTCHFIELD, (hereinafter "PLAINTIFF"), is a resident of the County of Wayne, State of Michigan.

20.    Defendant, City of Detroit (hereinafter "DEFENDANT DETROIT"), is a municipal corporation located in the County of Wayne, State of Michigan.

21.    Defendant, MARC THOMPSON (hereinafter "DEFENDANT THOMPSON"), was at all relevant times a City of Detroit Police Detective and employed by DEFENDANT DETROIT and acting under color of law and within the scope of his employment.

22.    Defendant, ANTHONY WILLIAMS (hereinafter "DEFENDANT WILLIAMS"), was at all relevant times a City of Detroit Police Officer and employed by DEFENDANT DETROIT and acting under color of law and within the scope of his employment.

23.    Defendant, DORIAN HARDY (hereinafter "DEFENDANT HARDY"), was at all relevant times a City of Detroit Police Officer and employed by DEFENDANT DETROIT and acting under color of law and within the scope of his employment.

24.    Defendant, JEREMY MORROW (hereinafter "DEFENDANT MORROW"), was at all relevant times a City of Detroit Police Officer and employed by DEFENDANT DETROIT and acting under color of law and within the scope of his employment.

25.    Defendant, JOSHUA HOLDER (hereinafter "DEFENDANT HOLDER"), was at all relevant times a City of Detroit Police Officer and employed by

DEFENDANT DETROIT and acting under color of law and within the scope of his employment.

26. Defendant, MATTHEW McKINNEY (hereinafter "DEFENDANT McKINNEY"), was at all relevant times a City of Detroit Police Officer and employed by DEFENDANT DETROIT and acting under color of law and within the scope of his employment.

27. Defendant, SABRINA CARRION (hereinafter "DEFENDANT CARRION"), was at all relevant times a City of Detroit Police Officer and employed by DEFENDANT DETROIT and acting under color of law and within the scope of her employment.

28. Defendant, CAREEMA YOPP (hereinafter "DEFENDANT YOPP"), was at all relevant times a City of Detroit Police Officer and employed by DEFENDANT DETROIT and acting under color of law and within the scope of her employment.

29. Officers are collectively known as DEFENDANT OFFICERS.

## FACTS

### INITIAL INCIDENTS

30. Upon information and belief, on December 27, 2023, Detroit Police were called to an apartment building located at 14409 Linhurst Street Detroit, MI 48205 for a reported shooting.

31.    Upon information and belief, when Detroit Police arrived, they made contact with the victim of the shooting, Kalin Griffin.

32.    Upon information and belief, the Detroit Police then conducted an onsite investigation which revealed that the victim went to the location to visit friends and eventually began to drink and play cards.

33.    Upon information and belief, the suspect was present, drinking from a Nikolai vodka bottle and waving a black and silver handgun.

34.    Upon information and belief, witnesses stated that after observing the suspect's actions said, "get this girl, she is waving a gun around." Shortly after, the victim and suspect left the area of the card game and went inside Apartment #4 of the building.

35.    Upon information and belief, moments later, a single gunshot was heard from inside the apartment. The suspect exited with miscellaneous items and a young child.

36.    Upon information and belief, witnesses observed the suspect enter a brown Ford Fusion bearing Michigan license plate # ERE8295 with miscellaneous items and a young child. She was approximately 40–48 years old, wearing a head wrap and black coat.

37.    Upon information and belief, witnesses gave the street name "Truth" for the suspect.

38.   Upon information and belief, witness further stated that there was an ongoing attempt to "get at" the victim since Christmas Eve and that Truth becomes very hostile while drinking.

39.   Upon information and belief, Mr. Griffin stated he and the suspect had been joking with each other as he sat in a chair just before she shot him in the face. He further reported that the suspect took $500 from his pocket before leaving with her child.

40.   Upon information and belief, on December 29, 2023, a LEIN inquiry made by Officer Ja'Mond Jones revealed the brown Ford Fusion was registered to Lenn Alec Porterico.

41.   Upon information and belief, a search of Lenn Alec Porterico revealed that he and a woman by the name of Sheila Lloyd had the same address.

42.   Officers searched Sheila Lloyd's name in a LEIN inquiry and discovered another address for her that being 11343 Warwick Street.

43.   Upon information and belief, after searching the 11343 Warwick address, Officers discovered a LaDonna Crutchfield lived at that address who the Officers said matched the suspect.

44.   Upon information and belief, on the same day, further review connected the suspect, "Truth" to two violent prior incidents occurring on December 14,

2023 and December 15, 2023 against Mark May and Kris May involving a 2008 Chrysler Sebring (MI plate # EQX4853).

45.     Upon information and belief, at one of the incidents, the suspect eventually exited a 2008 Chrysler Sebring that had been stolen from Mark May, and fled in a Beige Ford Fusion with MI Plate # 895, the same vehicle which suspect fled in this current incident.

46.     Upon information and belief, it was also discovered that Mark May had been dating the suspect for ten (10) years, but was unable to give any information about the suspect.

47.     Upon information and belief, Mark May was able to provide a phone number for the suspect.

48.     On December 30, 2023, witness Quentyara Wilson was presented a photo lineup. PLAINTIFF was presented in the series of photos viewed by the witness, but PLAINTIFF was not identified as the suspect.



Double Blind Photo Lineup
Presented to Quentyara Wilson



49.     On January 4, 2024, DEFENDANT YOPP presented a double-blind photo lineup to the victim Kalin Griffin at St. John Hospital. PLAINTIFF was

presented in the series of photos viewed by the victim, but PLAINTIFF was not identified as the suspect.



Double Blind Photo Lineup
Presented to Kalin Griffin

50. It is worth noting that PLAINTIFF is the only person included in the photo lineups shown to both the victim and the witness.

51. Still after both the victim and the witness stated that PLAINTIFF was not the suspect, the Detroit Police made the decision to arrest PLAINTIFF.

52. Detroit Police ignored exculpatory evidence to arrest PLAINTIFF without probable cause including the following facts:

   a. Eyewitness Identifications – Both the victim and a key witness viewed PLAINTIFF in a photo lineup and affirmatively stated that it was not PLAINTIFF (See Exhibit 1, Double Blind Photo Line-Up Presented to Quentyara Wilson and Exhibit 2, Double Blind Photo Line-Up Presented to Kalin Griffin);

b. Vehicle Identification- The suspect was reported to be in a different vehicle than PLAINTIFF, but this was not investigated (See Exhibit 3, DEFENDANT WILLIAMS Case Supplemental Report);

c. Prior Incidents – The suspect was involved in multiple prior incidents connected to the case and knew other individuals at the location where the shooting occurred (See Exhibit 4, Witcher Reporting Officer Narrative and Exhibit 5, Incident/Investigation Report)

d. Known Associations – The suspect was familiar with both witnesses and victims, and even knew people at the party where the shooting occurred, yet police failed to clarify these relationships to rule out suspect (See Exhibit 5, Incident/Investigation Report);

e. Witness Interviews – Police did not interview key witnesses, including Lenn Alec Porterico, and ignored at least six other witnesses who were not questioned (See Exhibit 5, Incident/Investigation Report and Exhibit 6, DEFENDANT THOMPSON Case Supplement Report);

f. Nickname Evidence – A nickname linked to the actual suspect was provided but never pursued (See Exhibit 7, Car Jacking Incident Report Suspect List);

g. Physical Evidence – An alcohol bottle left at the scene, bearing potential DNA or fingerprint evidence, was not timely tested or used to

exclude PLAINTIFF (See Exhibit 8, DNA Test on Vodka Bottle and Exhibit 9, DEFENDANT THOMPSON Body Camera Video)

h. Relationship History – Police ignored the fact that the actual suspect had dated one of the victims in another case for more than ten years, a critical lead that distinguished the actual suspect from PLAINTIFF (See Exhibit 4, Witcher Reporting Officer Narrative)

i. Cell Phone Records – Officers had the actual suspect's cell phone number, but failed to investigate or use it to locate or verify her identity (See Exhibit 7, Car Jacking Incident Report Suspect List);

j. Suspect's Address – The owner of the Ford Fusion, Lenn Alec Porterico, and the suspect shared the 5044 Hillsboro Street Address (See Exhibit 6, DEFENDANT THOMPSON Case Supplement Report and Exhibit 10, Crime Scene Investigation Document).

53. Upon information and belief, PLAINTIFF was identified as the suspect in this matter despite all the foregoing inconsistencies and without reviewing all relevant evidence including witness accounts and DNA evidence (See Exhibit 11, Shooting Incident Report Suspect List).

## PLAINTIFF'S ARREST

54.   PLAINTIFF was 36 years of age, single with three children, and she provides for her niece Brieal (Brieal's mother died of COVID in 2021).

55.   PLAINTIFF is the sole provider for her three children and her niece Brieal.

56.   PLAINTIFF is forced to work two jobs to make ends meet.

57.   PLAINTIFF works her first job from 9:00 a.m. to 1:00 p.m. weekdays where she is an assistant to individuals with mental health issues and mental delays.

58.   PLAINTIFF works her second job from 9:00 p.m. to 7:00 a.m. weekdays where she manages group homes for Detroit Wayne Integrated Health.

59.   On January 23, 2024, the Fugitive Apprehension Services Team unit went to PLAINTIFF's home to arrest her, allegedly based on probable cause purportedly established through DEFENDANT THOMPSON's investigation (See Exhibit 12, DEFENDANT HOLDER Case Supplemental Report)

60.   On January 23, 2024, at 2:08 p.m., PLAINTIFF was lying in her bed reading to her five-year old daughter prior to going to sleep to get some rest to head off to her second job.

61.   Suddenly, PLAINTIFF heard a loud knock at her door.

62.   Brieal approached the door and noticed six Detroit Police Officers.

63.   When Brieal asked why they were there, she was told by the Officers that they were looking for LaDonna Crutchfield (PLAINTIFF).

64.   Brieal went and got PLAINTIFF out of bed, and informed her that there were six Detroit Police Officers at her door looking for her.

65.   PLAINTIFF opened her front door and was puzzled by so many officers surrounding her home and asking if she was LaDonna Crutchfield (See Exhibit 13, DEFENDANT WILLIAMS Body Worn Camera).

66.   Once PLAINTIFF told the Officers that she was LaDonna Crutchfield, DEFENDANT WILLIAMS demanded that PLAINTIFF step outside of her home.

67.   DEFENDANT WILLIAMS would not tell PLAINTIFF why he wanted her to step outside of her home.

68.   PLAINTIFF stepped outside of her home wearing no shoes.

69.   Once PLAINTIFF stepped outside, DEFENDANT WILLIAMS informed PLAINTIFF that she was going to jail today, and he didn't want to arrest her in front of her children.

70.   PLAINTIFF constantly asked the Officers why she was going to jail, but the officers refused to tell PLAINTIFF why she was going to jail.

71.   DEFENDANT HARDY finally stated to PLAINTIFF, "So basically, you had to go to court. They summoned you to court and you didn't show up. I don't know if it got lost in the mail or whatever, but it says that you have a warrant for your arrest. All this means is that you have to come to court."

72.     This statement made by DEFENDANT HARDY was not true - PLAINTIFF did not have a warrant for her arrest.

73.     PLAINTIFF was not aware that DEFENDANT HARDY was not being truthful when stating that PLAINTIFF had a warrant for her arrest, and PLAINTIFF constantly told the Officers that she did not receive anything in the mail.

74.     DEFENDANT WILLIAMS told PLAINTIFF to ask her family members for shoes without shoestrings - PLAINTIFF directed her family member to get her Crocs.

75.     While on the porch, DEFENDANT CARRION searched PLAINTIFF.

76.     PLAINTIFF was walked down the street in front of all of her neighbors and at one point almost fell while walking and placed in handcuffs.

77.     PLAINTIFF was told to place her hands behind her back, and PLAINTIFF asked if she could be handcuffed in the front of her body because she has asthma and being handcuffed behind her back might affect her breathing.

78.     DEFENDANT WILLIAMS informed PLAINTIFF that it was against department policy to handcuff her in the front of her body.

79.     PLAINTIFF was handcuffed from the back of her body and placed in the back seat of the police vehicle.

80.  While in the police vehicle, DEFENDANT WILLIAMS contacted
     DEFENDANT THOMPSON, stating, "We have her in custody do you want
     her phone for evidence." PLAINTIFF was then asked by DEFENDANT
     WILLIAMS to give her phone number (See Exhibit 3, DEFENDANT
     WILLIAMS Case Supplemental Report).

81.  Once in the police vehicle, PLAINTIFF learned that she was being arrested
     for assault with attempt to murder because DEFENDANT HOLDER had
     typed the charges into the computer located in the police vehicle, and
     PLAINTIFF was able to view what DEFENDANT HOLDER had typed in the
     vehicle's computer.

82.  PLAINTIFF became distraught on her ride over to the Detroit Detention
     center because her children witnessed her being arrested (See Exhibit 14, Rear
     Seat Camera Video).

83.  PLAINTIFF was transported to the Detroit Detention Center and escorted in
     by DEFENDANT HOLDER to the booking area to be searched,
     photographed, fingerprinted, and lead to lock-up (See Exhibit 15, Booking
     Information and Exhibit 16, Mug Shot Report).

84.  After approximately two hours, PLAINTIFF was escorted from lock-up by
     officers to an area where DEFENDANT THOMPSON and DEFENDANT
     YOPP were waiting.

85.   PLAINTIFF was then interviewed by DEFENDANT THOMPSON.

86.   PLAINTIFF was shown several photos of a black heavy-set woman (See Exhibit 17, First Photo of Suspect and Exhibit 18, Second Photo of Suspect).

87.   PLAINTIFF noticed that the photos contained a heavy-set black woman wearing a bonnet, and DEFENDANT THOMPSON asked PLAINTIFF if that was her.

88.   PLAINTIFF immediately stated "no" and explained to DEFENDANT THOMPSON that she does not wear bonnets.

89.   DEFENDANT THOMPSON jokingly stated to PLAINTIFF that, "you got to admit it - that looks like you, and PLAINTIFF replied, "Why? Because I am fat and black like her?"

90.   DEFENDANT THOMPSON went on to explain to PLAINTIFF that there was a shooting, and he believed that she was involved in the shooting according to his investigation (See Exhibit 11, Shooting Incident Report Suspect List)

91.   DEFENDANT THOMPSON gave PLAINTIFF the location, date, and time of the alleged crime.

92.   DEFENDANT THOMPSON also gave PLAINTIFF other details about the shooting.

93.   **PLAINTIFF told DEFENDANT THOMPSON that she was at work on the date and time of the shooting, and she could prove it.**

94.   DEFENDANT THOMPSON turned to his partner – DEFENDANT YOPP, and told her that, "I don't believe Ms. Crutchfield (PLAINTIFF) did the shooting."

95.   DEFENDANT YOPP also agreed that she did not believe that Ms. Crutchfield (PLAINTIFF) did the shooting.

96.   DEFENDANT THOMPSON asked DEFENDANT YOPP did she have any questions for PLAINTIFF, but DEFENDANT YOPP said no because she left her questions back at the office.

97.   DEFENDANT THOMPSON told PLAINTIFF that she needed to finish being processed, and that he needed to get back to his office to turn some paperwork in, so that PLAINTIFF could be released immediately.

98.   DEFENDANT THOMPSON told PLAINTIFF that if she was not released that night, that he would personally come back to the Detroit Detention Center the next day to take PLAINTIFF home.

99.   PLAINTIFF needed to be released as soon as possible because she would have lost her second job if she missed work.

100. PLAINTIFF was told by another female officer that she could be released if she agreed to have her thumbprints taken again, and if she would submit to a DNA swab.

101. PLAINTIFF was forced to give her thumbprints and her DNA which was not requested during the initial booking, **although PLAINTIFF was not involved in the alleged crime.**

102. PLAINTIFF was released from lock-up at approximately 8:05 p.m. and was provided a ride home by her mother - where her terrified children and her niece Brieal were there waiting.

## FOLLOWING PLAINTIFF'S ARREST

103. PLAINTIFF explained to her children that she was fine and that it was a case of mistaken identity.

104. PLAINTIFF's children were still in shock when they learned that their mother (PLAINTIFF) was leaving them again as she had to go to her second job.

105. PLAINTIFF drove to work, and she could not stop crying thinking about her children witnessing her being arrested.

106. PLAINTIFF was also terrified because she had been informed by an unknown officer at the Detroit Detention Center that she could possibly be arrested again for this matter.

107. PLAINTIFF's crying continued while at work and she was of no assistance to the mentally challenged adults that she cared for at her second job.

108. On January 24, 2024, PLAINTIFF went back to the station and demanded documentation that she was clear.

109. DEFENDANT THOMPSON apologized and explained to PLAINTIFF that his sergeant informed him that PLAINTIFF should have never been arrested. PLAINTIFF was provided a letter that stated, "I am now able to declare Ms. Crutchfield is not the subject involved in this criminal investigation" (See Exhibit 19, Letter from Detective Marc Thompson).

110. On the same day, DEFENDANT THOMPSON prepared a report one day after PLAINTIFF's interrogation leaving out the fact that PLAINTIFF had been placed in two separate photo line-ups on December 30, 2023, and January 4, 2024 (See Exhibit 6, DEFENDANT THOMPSON Case Supplement Report).

111. On September 9, 2024, swabs from the vodka bottle recovered at the scene were submitted to the Michigan State Police Forensic Laboratory (See Exhibit 8, DNA Test on Vodka Bottle).

112. On September 12, 2024, results indicated the DNA profile collected from the vodka bottle matched the actual suspect – Shuvonne Vinson.

113.   On November 9, 2024, Officer Marc Thompson presented Mr. Griffin with another photo lineup. He emphatically identified Shuvonne Vinson as the person who shot him stating "That's that Bitch [sic]".



Double Blind Photo Lineup
Presented to Kalin Griffin on
11/9/24

## COUNT I
## FALSE ARREST AND IMPRISONMENT IN VIOLATION OF THE
## FOURTH AMENDMENT AND 42 U.S.C. § 1983
## (DEFENDANTS)

114.   PLAINTIFF incorporates by reference the above paragraphs.

115.   The Fourth Amendment to the United States Constitution guarantees the right of the people to be secure in their persons against unreasonable searches and seizures. This guarantee prohibits law enforcement officers from restraining a person's liberty unless supported by probable cause.

116.   At all relevant times, DEFENDANTS were acting under color of state law.

117. DEFENDANTS, without probable cause, seized PLAINTIFF's person and subjected her to arrest and imprisonment.

118. The arrest and imprisonment of PLAINTIFF were not based on facts or circumstances that would warrant a prudent officer in believing that PLAINTIFF had committed a crime.

119. By falsely arresting and imprisoning PLAINTIFF without probable cause, DEFENDANTS violated PLAINTIFF's clearly established rights under the Fourth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

120. As a direct and proximate result of DEFENDANTS' unlawful actions, PLAINTIFF suffered loss of liberty, humiliation, severe emotional distress, and other damages.

## <u>COUNT II</u>
## ILLEGAL SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983
## (DEFENDANTS)

121. PLAINTIFF incorporates by reference the above paragraphs.

122. The Fourth Amendment to the United States Constitution guarantees the right of the people to be secure in their homes and persons against unreasonable searches and seizures. This protection prohibits law enforcement officers from conducting searches or collecting bodily samples without probable cause or lawful justification.

123.  At all relevant times, DEFENDANTS were acting under color of state law.

124.  DEFENDANTS unlawfully conducted a search of PLAINTIFF at her home, without probable cause or lawful justification.

125.  DEFENDANTS unlawfully seized PLAINTIFF's personal property, including her phone, as evidence, without probable cause or lawful justification.

126.  DEFENDANTS also unlawfully seized and collected PLAINTIFF's fingerprints and DNA without probable cause or lawful justification.

127.  These actions were not based on facts or circumstances that would warrant a prudent officer in believing such searches and seizures were justified, nor were they otherwise legally authorized.

128.  By unlawfully searching PLAINTIFF, seizing her phone, and seizing her fingerprints and DNA, DEFENDANTS violated PLAINTIFF's clearly established rights under the Fourth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

129.  As a direct and proximate result of DEFENDANTS' unlawful actions, PLAINTIFF suffered loss of privacy, invasion of bodily integrity, humiliation, severe emotional distress, and other damages.

## COUNT III
### ASSAULT AND BATTERY
### (DEFENDANTS)

130.  PLAINTIFF incorporates by reference the above paragraphs.

131.  DEFENDANT OFFICERS, acting individually and/or in concert, intentionally and unlawfully threatened PLAINTIFF with imminent harm by forcibly detaining her without justification.

132.  DEFENDANT OFFICERS' actions included physically restraining PLAINTIFF, placing her in handcuffs, and ignoring her requests for accommodations despite her medical condition, causing unnecessary physical pain and emotional distress.

133.  DEFENDANT OFFICERS had the apparent ability to carry out their threats and acted in a manner that created a reasonable fear of bodily harm to PLAINTIFF.

134.  DEFENDANT OFFICERS willfully and intentionally touched PLAINTIFF in a harmful and offensive manner by handcuffing and transporting PLAINTIFF to jail against her will.

135.  The actions of DEFENDANT OFFICERS were neither lawful nor privileged.

136.  As a direct and proximate result of DEFENDANT OFFICERS' actions, PLAINTIFF suffered physical pain, emotional distress, humiliation, and other damages.

## COUNT IV
## FALSE LIGHT
## (DEFENDANTS)

137.   PLAINTIFF incorporates by reference the above paragraphs.

138.   DEFENDANT OFFICERS made disclosures to the general public or to a large number of people through their actions, including the public and visible arrest of PLAINTIFF in front of her home, being viewed by neighbors, and family members.

139.   These disclosures were highly objectionable to a reasonable person, as they attributed to PLAINTIFF's characteristics, conduct, or beliefs that were false and placed PLAINTIFF in a false light, suggesting she was a violent criminal.

140.   DEFENDANT OFFICERS had knowledge of the falsity of the disclosed information or acted in reckless disregard as to the truth of the disclosed information and the false light in which PLAINTIFF would be placed.

141.   In the manner described more fully above, DEFENDANT OFFICERS engaged in extreme and outrageous conduct by arresting PLAINTIFF without probable cause, falsely accusing her of assault with attempt to murder, and misrepresenting the existence of an arrest warrant.

142.   DEFENDANT OFFICERS continued the criminal process against PLAINTIFF, despite knowing or having sufficient information to determine that PLAINTIFF was innocent.

143.   DEFENDANT OFFICERS knew or should have known that their conduct would cause severe emotional distress to PLAINTIFF, especially in light of the public nature of the arrest and the presence of her children and neighbors.

144.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of PLAINTIFF.

145.   As a proximate result of this misconduct, PLAINTIFF suffered injuries, including but not limited to severe emotional distress, reputational harm, and humiliation.

## COUNT V
## FAILURE TO INVESTIGATE AND SUPPRESSION OF EXCULPATORY EVIDENCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983
### (DEFENDANT THOMPSON)

146.   PLAINTIFF incorporates by reference the above paragraphs.

147.   Law enforcement officers have a duty under the Constitution not only to avoid fabricating evidence, but also to conduct investigations in a manner that does not deliberately ignore exculpatory evidence. The Due Process Clause of the Fourteenth Amendment prohibits officers from concealing or suppressing information that negates guilt.

148.   Specifically, DEFENDANT THOMPSON:

a.   Ignored victim and witness statements affirmatively indicating that PLAINTIFF was not the suspect who committed the shooting;

b. Failed to interview readily available witnesses connected to the incident, including individuals who knew the actual suspect;

c. Disregarded a known nickname and personal connections of the suspect that pointed away from PLAINTIFF;

d. Failed to send an alcohol bottle left at the scene by the suspect for testing until nearly ten months later, despite its obvious evidentiary value;

e. Overlooked that the true suspect was personally familiar with the victims and witnesses;

f. Failed to obtain or analyze readily available phone records linking the actual suspect to victims and witnesses, despite such records being critical to confirming the suspect's identity.

149. By suppressing these exculpatory facts and failing to reasonably investigate, DEFENDANT THOMPSON deprived PLAINTIFF of her liberty without probable cause, manufactured a false case against her, and caused her unjustified arrest and detention.

150. As a direct and proximate result, PLAINTIFF suffered unlawful seizure, humiliation, severe emotional distress, reputational harm, and economic damages.

151. Although DEFENDANT THOMPSON claimed that his actions established probable cause, the suppressed and ignored evidence in fact eliminated any basis for probable cause.

152. DEFENDANT THOMPSON's conduct violated clearly established constitutional rights of which a reasonable officer would have been aware.

**COUNT VI**
**MONELL CLAIM 42 U.S.C. §1983**
**MUNICIPAL/SUPERVISORY LIABILITY**
**(DEFENDANT DETROIT)**

153. PLAINTIFF incorporates by reference the above paragraphs.

154. DEFENDANT DETROIT acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs, policies, and/or practices that resulted in violations to PLAINTIFF.

155. These customs, policies, and/or practices included but were not limited to the following:

    a. Failing to supervise officers to prevent violations of citizens' constitutional rights;

    b. Failing to adequately train and/or supervise officers regarding proper use of force;

    c. Failing to adequately train and/or supervise officers regarding lawful arrests and the use of probable cause;

d. Failing to adequately train and/or supervise officers regarding proper investigation, including the evaluation of exculpatory evidence;

e. Failing to adequately train and/or supervise officers regarding legal search and/or seizures;

f. Failing to control and/or discipline officers known to harass, intimidate, and/or abuse citizens;

g. Failing to supervise, review, and/or discipline officers whom DEFENDANT DETROIT knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or encouraging its police officers to engage in such conduct;

h. Failing to require compliance of its officers and/or employees with established policies and/or procedures and/or rules and discipline or reprimand officers who violate these established policies;

156. PLAINTIFF's injuries in this case were proximately caused by policies and practices of DEFENDANT DETROIT, which, by its deliberate indifference, allows its police officers to violate the Constitutional rights of citizens without fear or any meaningful investigation or punishment. In this way, DEFENDANT DETROIT violated PLAINTIFF's rights since it created the

opportunity for the individually named DEFENDANT OFFICERS to commit the foregoing Constitutional violations.

157.  The misconduct described in the preceding paragraphs has become a widespread practice, and so well settled as to constitute de facto policy in the DEFENDANT DETROIT's police department. This policy was able to exist and thrive because government policymakers have exhibited deliberate indifference to the problem, thereby ratifying it.

158.  The widespread practices described in preceding paragraphs were allowed to flourish because DEFENDANT DETROIT has declined to implement sufficient hiring, training, and/or legitimate and/or effective mechanisms for oversight and/or punishment of police officers' misconduct.

159.  The policies and practices of DEFENDANT DETROIT directly and proximately led to the injuries PLAINTIFF suffered at the hands of DEFENDANT OFFICERS.

160.  As a direct and proximate result of said Constitutional violations, PLAINTIFF suffered loss of freedom, mental anguish, pain and suffering, loss of enjoyment of life, humiliation, degradation and emotional injuries, all past, present, and future.

## COUNT VII
## FAILURE TO INTERVENE
## (DEFENDANT OFFICERS)

161.   PLAINTIFF incorporates by reference the above paragraphs.

162.   DEFENDANT OFFICERS were aware that PLAINTIFF was being falsely arrested and imprisoned as they had no warrant for PLAINTIFF's arrest.

163.   DEFENDANT OFFICERS at the scene of the arrest failed to intervene and allowed other DEFENDANT OFFICERS to arrest PLAINTIFF without having a warrant for her arrest.

164.   DEFENDANT OFFICERS at the scene of the arrest failed to intervene and where DEFENDANT lied to PLAINTIFF about having a warrant for her arrest without intervention.

165.   DEFENDANT YOPP failed to intervene when the officer in charge interrogated PLAINTIFF at the Detroit Detention Center when DEFENDANT YOPP knew PLAINTIFF was not the suspect.

166.   DEFENDANT OFFICERS had a reasonable opportunity to intervene where these instances occurred but failed to do so.

167.   DEFENDANT OFFICERS chose not to intervene, and allowed PLAINTIFF'S constitutional rights to be violated.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (DEFENDANTS)

168.  PLAINTIFF incorporates by reference the above paragraphs.

169.  In the manner described more fully above, DEFENDANT OFFICERS engaged in extreme and outrageous conduct.

170.  DEFENDANT OFFICERS knew that they didn't have an arrest warrant for PLAINTIFF's arrest, or probable cause to arrest PLAINTIFF.

171.  DEFENDANT OFFICERS knew that there was a high probability that their conduct would cause severe emotional distress to PLAINTIFF.

172.  The misconduct described in this count was undertaken with malice, willfulness, and reckless indifference to the rights of PLAINTIFF.

173.  As a proximate cause of this misconduct, PLAINTIFF suffered injuries including but not limited to severe emotional distress.

**WHEREFORE**, PLAINTIFF prays for:

    a. Compensatory non-economic and economic damages that may be proven at trial to compensate PLAINTIFF;

    b. Exemplary/Punitive damages that may be proven at trial;

    c. Reasonable attorney fees, costs, and interest pursuant to 42 U.S.C. §1988; and,

d.  Such other and further relief as appears reasonable and just under the

circumstances.

Dated: September 12, 2025

/s/Ivan L. Land
Ivan L. Land (P65879)
Law Offices of Ivan L. Land, P.C.
25900 Greenfield Rd., Suite 210
Oak Park, MI  48237-1267
248.968.4545 / (f) 248.968.4540
ill4law@aol.com
**Attorney for PLAINTIFF**

**VERIFICATION**

LaDonna Crutchfield, being duly sworn, deposes and says: I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Date: 9.12.25

LaDonna Crutchfield

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Second Amended Verified Complaint with the Court Clerk via CM/ECF on September 12, 2025, to serve all parties.


Dated: September 12, 2025                    Respectfully Submitted,


                                            /s/Ivan L. Land
                                            Ivan L. Land (P65879)