**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN – SOUTHEASTERN DIVISION**

LADONNA CRUTCHFIELD,                    Hon. Brandy R. McMillon
    Plaintiff,                              Case No.: 25-cv-10514

- vs -

CITY OF DETROIT, *et al*,
    Defendants.

_____/

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    **NOW COME**, Defendants, by and through their attorney, Gregory B. Paddison, and for their Brief in Support of Defendants' Motion for Summary Judgment, Defendants state as follows:

**RELEVANT FACTUAL BACKGROUND**

    The relevant facts in this case are largely undisputed.

**The Search for Truth:** On December 28, 2023, Kaylin Griffin ("Mr. Griffin") was the victim of an Assault with Intent to Murder ("AWIM"). Seeing Mr. Griffin with a gunshot wound to the face, responding Detroit Police Department ("DPD") Officers secured the scene and waited for medics to arrive. Ofc. Thompson Report, Exhibit "A". Thereafter, witnesses Shyanna Harris ("Ms. Harris") and Raymond Ficklin ("Mr. Ficklin), reported that the female suspect and Mr. Griffin were inside an apartment when the woman began waiving a gun around. While neither witness was in the apartment when the shooting occurred, both heard the gunshot. *Id*. Ms.

1

Harris added that the assailant fled in a tan Toyota with a young child. *Id*. Additional DPD personnel soon arrived to assist in the investigation.

Officer Darrell Cowart, obtained an expanded description of the assailant from a third witness, Quentyara Wilson ("Ms. Wilson"), who knew the suspect by the pseudonym "Chew[,]" confirmed a child was with "Chew," and described "Chew" as roughly six feet tall, three-hundred pounds, with a bun hat, lashes, a black jacket, purple shirt, and slide-on (shoes). <u>Ofc. Cowart Report, Exhibit "B"</u>. Meanwhile, after obtaining an identity for Mr. Griffin, who was refusing to give his name to physicians at St. John Hospital, Officer Stephan Jackson discovered that the assailant was had a second pseudonym, "Truth[.]" <u>Ofc. Jackson Report, Exhibit "C"</u>. As the investigation continued, officers used surveillance videos to determine that the tan Toyota, was in fact, a beige Ford Fusion, license plate ERE8295 (the "Ford").

On December 29, 2023, Officer Ja'Mond Jones ("Ofc. Jones") conducted a search relative to the Ford, discovering that it was registered to Lenn Alec Porterico ("Mr. Porterico") of 5044 Hillsboro St. <u>Ofc. Jones Report, Exhibit. "D"</u>.  Knowing the suspect was female, Ofc. Jones searched for women registered to the address, locating "Sheila Loyd" a/k/a "Crutchfield" ("Ms. Loyd"). After comparing Ms. Loyd's state ID with surveillance images of the assailant, Ofc. Jones eliminated Ms. Loyd as a potential suspect, but digging deeper, discovered that Ms. Loyd had a second registered address at 11343 Warwick St. *Id*.  When he inquired into the

occupants of the Warwick St. address, Ofc. Jones located, *inter alia*, Ms. Loyd's adult daughter, LaDonna Crutchfield ("Plaintiff" or "Ms. Crutchfield") and a four-year-old child. Exhibit "D".[1] Noting similarities in the appearances of Ms. Cruthcfield and the suspect, Ofc. Jones forwarded his findings to Detective Marc Thompson ("Det. Thompson"), the officer-in-charge ("OIC") of the criminal investigation. Exhibit "D".

After reviewing Ofc. Jones' findings, Det. Thompson searched police records for the pseudonyms "Chew" and "Truth," discovering two police reports arising out of incidents occurring two weeks before the shooting (December 14 and 15, 2023), involving a female with the alias "Truth" and who matched the physical description of the AWIM suspect. Det. Thompson Report, Exhibit "G".[2]  Neither victim in these incidents (brothers, Mark and Kris May) could, *or were willing to*, identify "Truth" by name, despite Kris May having dated "Truth" for ten years. Exhibit "I" at Pg.5.

Notably however, in the later of these two incidents, "Truth" was armed with a handgun and driving the same Ford referenced above. Exhibit "I". In both instances, surveillance captured a woman matching Ms. Crutchfield's (and the AWIM suspect) appearance (Compare Exhibits "J" and "K"), leading Det. Thompson to believe that

---

[1] See also, Request to Admit Responses, Exhibit "E" at Pg. 7, at ¶24; and Interrogatory Responses, Exhibit "F" at Pgs. 5-6, at ¶ 9.

[2] See also, "Truth" Police Reports 1 & 2, Exhibits "H" & "I".

Ms. Crutchfield and "Truth" were one-in-the-same and naming Ms. Crutchfield as the suspect in his (AWIM) investigation. <u>Suspect List, Exhibit "L"</u>.

However, the investigation quickly began to cool. On December 30, 2023, Officers presented a photo line-up containing Ms. Crutchfield's image to Ms. Wilson, who could not make a positive identification. <u>Wilson Line-Up, Exhibit "M"</u>. The same is true for Mr. Griffin, who was shown a photo line-up on January 4, 2024, but was also unable to make an identification. <u>Griffin Line-Up, Exhibit "N"</u>. Again, and as with **all** other witnesses, Mr. Griffin was unable, *or was unwilling*, to provide the suspect's name to police. <u>Griffin Statement, Exhibit "O"</u>.

On January 11, 2024, Det. Thompson uncovered a possible 'break' in the investigation, learning that six weeks before Mr. Griffin was shot, Plaintiff (who had a separate vehicle registered in her name) was involved in a "Traffic Crash" involving a "H[it] & R[un]" with resulting property damage. <u>HIDTA Report, Exhibit "P"</u>. This, Det. Thompson believed, aligned with "Truth's" theft of Mark May's vehicle on December 14, 2023 (<u>Exhibit "H"</u>), and subsequent possession of the Ford, which had not been reported stolen.[3] Although the investigation was on-going,[4] at

---

[3] Initially, investigators did not contact Mr. Porterico for concern that he may '*tip-off*' the suspect.

[4] Including, but not limited to: i) Preparation of Geofence Search Warrants; ii) Submission of evidence to the Michigan State Police for DNA Testing; iii) Reviewing Plaintiff's bridge card usage; and iv) Combing Mr. Griffin's Social Media. <u>See, Exhibits "Q" – "T"</u>.

this point Det. Thompson believed that there was sufficient probable cause to request that DPD's "Fugitive Apprehension Services Team" ("FAST") apprehend Plaintiff and bring her in for questioning.

**FAST Arrest**: FAST is a specialized DPD unit tasked solely with apprehending fugitives with active arrest warrants, or whom a DPD Investigator advises that probable cause for an arrest exists and requests their apprehension. Ofc. Williams Affidavit, Exhibit "U" at Pg. 1, ¶ 4.  Although FAST is provided a Person of Interest Report ("POI Report") when tasked with an apprehension,[5] FAST officers are not involved in underlying criminal investigations. So, absent something being blatantly incorrect, inaccurate, or incomplete in the POI Report, FAST officers do not typically question the OIC of the underlying investigation about an assignment. Id. at Pg. 3, ¶¶ 10-11.

After a POI Report was prepared, a FAST Team consisting of Officers Anthony Williams (the FAST OIC),[6] Dorain Hardy, Jeremy Morrow, Joshua Holder, Matthew McKinney, and Sabrina Carrion (collectively, "FAST Officers"), were tasked with Plaintiff's apprehension. On January 23, 2024, FAST Officers arrived at

---

[5] Usually containing: i) the nature of the underlying crime; ii) a brief synopsis of the facts establishing probable cause; iii) suspect photographs; iv) aliases; v) criminal history; vi) known contacts; vii) a physical description; and viii) other pertinent information (address, phone, social media, etc.) that is available. Id. at Pg. 2, ¶ 7.

[6] Distinct from Det. Thompson, the OIC of the criminal investigation.

Plaintiff's home to take her into custody. Receiving no response after knocking on the front door, Officers tapped on the window to alert the occupants of their presence. <u>Ofc. Williams Body-Worn Camera ("BWC"), Exhibit "V" beginning at 0:00:30</u>.[7] When Plaintiff eventually answered the door, Ofc. Williams politely greeted her, confirmed her identity, and asked her to step outside. <u>Id. beginning at 0:01:20</u>. Once Plaintiff had exited the house and informed officers that her children were inside, Ofc. Williams explained that although Plaintiff had to go to jail, he didn't want to arrest her in front of her children. <u>Id</u>.; Exhibit "U" at Pg. 4, ¶ 14. Confused (understandably in hindsight), Plaintiff began asking why she had to go to jail, to which FAST Officers responded by stating that apparently, she'd failed to appear for court. <u>Id. beginning at 0:02:00</u>.[8]

Although continuing to express her confusion, Plaintiff complied with Ofc. Williams' instructions, as she was patted down by Ofc. Carrion (the only female officer on scene). <u>Exhibit "V" beginning at 0:02:30; Exhibit "U" at Pg. 4, ¶ 14</u>. A few non-confrontational minutes later, after her nineteen-year-old niece retrieved her shoes, phone, and jacket, Plaintiff was walked (without handcuffs) to a police

---

[7] This recording is being transcribed and will be filed as Supplemental Exhibit "EE."

[8] FAST occasionally informs suspects that their arrest is related to a minor offense, as suspects are less likely to attempt to flee or resist while believing their arrest is related to a minor, rather than more serious charge. <u>Exhibit "U" at Pgs. 3-4, ¶ 12</u>.

vehicle parked down the street, out of her children's sight. At this point, Plaintiff was finally handcuffed and then transported to the Detroit Detention Center ("DDC"), again without incident. <u>Id</u>. beginning at 0:05:30.[9]

In sum, video of Plaintiff's arrest exemplifies how civilians *should* cooperate with law enforcement and conversely, the type of courtesy, dignity, respect, and professionalism, law enforcement *should* employ when interacting with civilians.

**<u>Ofc. Yopp & the DDC</u>**:  Plaintiff arrived at the DDC at approximately 2:44 p.m., where she was booked and processed. <u>Detainee Input, Exhibit "W" at Pg. 1</u>. Two hours later, Det. Thompson and Careema Yopp ("Ofc. Yopp") arrived to take Plaintiff's statement. <u>Statement Form, Exhibit "X"</u>.

At the time, Ofc. Yopp was a recent addition to the 9th Precinct Detective Unit – Shooting Team ("9PDU"), which investigates non-fatal shootings in DPD's 9th Precinct. <u>Yopp Affidavit, Exhibit "Y" at Pg. 1, ¶ 3</u>.  Accordingly, at all times relevant, she was still receiving on the job training, 'shadowing' other investigators. <u>Id</u>. at Pgs. 1-2, ¶¶ 3-4, 8.  Specific to Det. Thompson's AWIM investigation, at the time of Plaintiff's arrest, Ofc. Yopp's **only** involvement had been presenting a photo line-up to Mr. Griffin. <u>Id</u>. at Pgs. 1-2, ¶ 3; see also, Exhibit "N".  In fact, Ofc. Yopp was so unfamiliar with the investigation, that she only learned of the request for

---

[9] Due to Plaintiff's body habitus and because Officers are not permitted to handcuff arrestees in the front of their body, two sets of interlocked handcuffs were used to avoid causing Plaintiff discomfort. <u>Exhibit "U" at Pg. 4, ¶ 16</u>.

Plaintiff's apprehension as she and Det. Thompson were driving to the DDC to question Plaintiff. *Id*. at Pg. 2, ¶¶ 5-6.

After explaining her Constitutional Rights (Exhibit "X") and gathering some background information, Plaintiff was question for roughly ten to fifteen minutes, before Det. Thompson was satisfied that Plaintiff was not the suspect he was looking for.  Det. Thompson then explained how she'd become a suspect and what the next steps were. In total, the interview lasted roughly thirty-five minutes before Det. Thompson explained that he had to return to his office to get Plaintiff released as soon as possible, adding that if she was not released that day, he would return to the DDC and personally drive her home. ECF No.: 31, Pg. ID 380, ¶¶ 97-98; Exhibit "Y" at Pg. 2, ¶¶ 7-11.

At 8:05 p.m., Plaintiff was released from the DDC, less than eight hours after FAST had first knocked on her door. Exhibit "W" at Pg. 4. Although the parties dispute whether Det. Thompson volunteered to provide Plaintiff with a letter clearing her of suspicion, or whether Plaintiff first demanded such a letter, the parties agree that a letter to this effect was provided the following day. ECF No.: 3-8, Pg. ID 64.

**Miscellaneous & Post Investigation**:  Plantiff alleges her thumbprints and DNA were obtained at the DDC *after* her discussion with Det. Thompson. ECF No.: 31, Pg. ID 381, ¶¶ 100-101 This order of events is both **highly unusual**, and is not

supported by the record.  Notably, the Arrest Report written by Ofc. Holder, one of the FAST Officers who transported Plaintiff to the DDC, was supplemented with a "JailID from LiveScan" at 3:38 p.m., over an hour before her interrogation started. Exhibit "Z". This fingerprint generated "ID" is referred to as a "TCN LiveScan." Exhibit "W" at Pg. 1 (TCN redacted).  Regardless, at the time of Plaintiff's arrest, the DDC was staffed and operated by the Michigan Department of Corrections ("MDOC"), rather than DPD.

After Plaintiff's arrest, the AWIM investigation went cold. The GeoFence search did not yield results for the phone numbers provided to law enforcement as belonging to "Chew" or "Truth,"  no useable DNA or fingerprints recovered from the Ford Fusion, and none of the witnesses or victims could, *or were willing*, to provide any information shedding light on the suspects identify.  However, on September 9, 2024, six months after Det. Thompson had sent it for testing (Exhibit "R"), DNA from a liquor bottle from Mr. Griffin's apartment returned a match, Shuvonne Vinson ("S. Vinson"). ECF No.: 31-9, Pg. ID 421. After being identified by Mr. Griffin, S. Vinson was arrested and has been charged with the crimes discussed in the preceding paragraphs and a litany of other horrific crimes, including a double-murder, following the December 28, 2023, shooting of Mr. Griffin.

## STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). "[T]he court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F3d 493, 497 (6th Cir 2003). If the movant carries its burden of showing the evidence in the record does not raise a genuine issue of material fact for trial, summary judgment may be appropriate. *Guiterrez v. Lynch*, 826 F2d 1534, 1536 (6th Cir 1987).

The burden then shifts to the non-moving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts," [*Matasushita Electric v. Zenith Radio*, 475 US 574, 586 (1986)] it must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F3d 906, 909 (6th Cir 2004). A factual dispute alone does not defeat a properly supported motion for summary judgment; the disputed fact must be material. *Anderson v. Liberty Lobby*, 477 US 242, 252 (1986). A fact is "material" when proof of that fact would establish or refute as essential element of a claim or a defense. *Kendell v. Hoover*, 751 F2d 171, 174 (6th Cir 1984).

## APPLICABLE LAW & ARGUMENT

### 1) SHOULD SUMMARY JUDGMENT BE GRANTED IN FAVOR OF DEFENDANTS AS TO COUNT I (FALSE ARREST & IMPRISONMENT) AS TO:

### a. Ofc. Yopp, for lack of material personal involvement:

As with all § 1983 claims, an officer's personal involvement in the alleged constitutional violation is a prerequisite to liability. *Robertson v. Lucas*, 753 F.3d

606, 618 (6th Cir. 2014). In the context of a false-arrest claim, there must be a "causal connection between the officer's actions and the alleged constitutional violation." _Sexton v. Cernuto_, 18 F.4th 177, 185 (6th Cir. 2021).

Again, at the time of Plaintiff's arrest, Ofc. Yopp's **only** involvement had been presenting a photo line-up to Mr. Griffin. Exhibit "Y" at Pgs. 1-2, ¶ 4; see also, Exhibit "N"; see also, Exhibit "N". In fact, Ofc. Yopp was so unfamiliar with the investigation, that she only learned of the request for Plaintiff's apprehension as she and Det. Thompson were driving to the DDC to question Plaintiff. _Id_. at Pgs. 1-2, ¶¶ 4-6. In other words, Ofc. Yopp's involvement did not have any connection, let alone a "causal connection" to Plaintiff's arrest, and as discussed below, _if anything_, the fact that Mr. Griffin did not identify Plaintiff in the photo line-up cuts against a connection between Plaintiff and the shooting of Mr. Griffin. Accordingly, Ofc. Yopp is entitled to Summary Judgment on this claim.

### b. The FAST Officers, premised upon Qualified Immunity and their good-faith reliance on the "Fellow Officer Rule?"

The collective-knowledge doctrine, also known as the fellow officer rule, permits law enforcement to act on information received from fellow officers. _Brown v. Lewis_, 779 F.3d 401, 412 (6th Cir. 2015). Police cannot be expected to cross-examine fellow officers about the foundation of information and the law imputes collective knowledge among law enforcement agencies and personnel. _United States v. Lyons_, 687 F.3d 754, 766 (2012). The doctrine applies even when the acting

11

officer was wholly unaware of the facts that established the requisite degree of suspicion. *Id.*; *United States v. Butler*, 223 F.3d 368, 371 (6ᵗʰ Cir. 2000).

Assuming, *for purposes of this argument*, that when he tasked FAST with Plaintiff's apprehension, Det. Thompson's probable cause assessment was incorrect, this does not mean that liability necessarily attaches to the FAST Officers. Instead, the law recognizes a good-faith defense for officers who rely on erroneous knowledge of others. *United States v. Hensley*, 469 U.S. 221, 232 (1985). "[A]n officer is not subjected to liability if he, through no improper action or inaction on his part," chooses a course of action that is "unconstitutional due to the error of a generally trustworthy source." *Brown*, supra at 413.[10]

> Where one officer's claim to qualified immunity from the consequences of a constitutional violation rests on his asserted good faith reliance on the report of other officers, the application of qualified immunity is based on what information was clear or should have been clear to the individual officer at the time of the incident and what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information. *Brown*, supra at 413 (quotations and citations omitted).

In this case, Ofc. Williams was informed that there was probable cause for Plaintiff's arrest, developed through the course of Det. Thompson's investigation.

---

[10] See also, *Hardesty v. Hamburg Township*, 461 F.3d 646, 656 (6ᵗʰ Cir. 2006); *abrogated on other grounds by Florida v. Jardines*, 569 U.S. 1 (2013) ["Pinckney officers entered the house () based upon the information provided by the Hamburg officers... Reliance upon such information insulates the Pinckney officers from civil liability in the event the information relied upon was defective"].

<u>Exhibit "U" at Pgs. 2-3, ¶¶ 8-11</u>. While provided only a summary of the circumstances purportedly establishing probable cause,[11] nothing in this summary gave Ofc. Williams reason to question Det. Thompson's apprehension request before briefing the FAST Officers on their assignment. <u>Id</u>. at Pg. 3, ¶ 11. In other words, the FAST Officers good-faith reliance on Det. Thompson's probable cause assessment entitles them to qualified immunity. An officer relying on what proves to be the flawed conclusions of a fellow officer is nonetheless entitled to qualified immunity as long as the reliance was objectively reasonable. <u>Stearns v. Clarkson, 615 F.3d 1278, 1286 (10th Cir.2010)</u>.[12] The "good-faith" defense shields objectively reasonable, good-faith, reliance on the statements of a fellow officer, but does not protect deliberate, reckless, or grossly negligent reliance on flawed conclusions of a fellow officer. <u>See, Rodriguez v. New York, 291 F. Supp. 3d 396, 417 (S.D.N.Y. 2018)</u>.[13]

---

[11] That Plaintiff had been identified as a suspect based upon: i) the appearance of Plaintiff and the assailant revealed through surveillance video; ii) the link between the Ford Fusion and Plaintiff; and iii) the presence of a child with the assailant matching the age of Plaintiff's child. <u>Id</u>. at Pgs. 2-3, ¶ 10.

[12] See also, <i>Oliver v. Woods,</i> 209 F.3d 1179, 1190–91 (10th Cir.2000) [Officers are entitled to rely on information relayed by other officers in determining whether there is probable cause but this reliance must be objectively reasonable].

[13] "[T]he catch team arrested Plaintiff as a result of information communicated by the observation team. There is nothing … to suggest [] the catch team understood the information they received to be false, or even untrustworthy… [The catch team] had no reason to believe that Plaintiff's constitutional rights were being violated…"

As Plaintiff cannot show that the FAST Officers' reliance on Det. Thompson's probable cause assessment was deliberately incorrect, reckless, or grossly negligent, the FAST Officers are entitled to Summary Judgment.

### c. All Defendant Officers as Probable Cause Existed for Plaintiff's Arrest and/or because the Officers are entitled to Qualified Immunity?

The preceding discussion is not intended to concede that probable cause for Plaintiff's arrest was lacking, or that Det. Thompson's probable cause assessment was unreasonable, even if ultimately incorrect. "**The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released**." _Baker v. McCollan_, 443 U.S. 137, 145 (1979) [**emphasis added**].

A false arrest claim requires that the arresting officer lacked probable cause to arrest the plaintiff." _Voyticky v. Village of Timberlake, Ohio,_ 412 F.3d 669, 677 (6th Cir.2005). "[A] warrantless arrest [] is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." _Devenpeck v. Alford_, 543 U.S. 146, 152 (2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." _Id._ at 152. An officer is required to "consider the totality of the circumstances," and cannot look only at the evidence of guilt while ignoring all exculpatory evidence when assessing probable cause. _Gardenhire v. Schubert_, 205 F.3d 303, 318 (6th Cir. 2000).

Whether probable cause existed in this case was a close call.

On one hand: i) Plaintiff and the suspect shared similar appearances and physical features (Exhibits "D" and "G"); ii) Plaintiff and the suspect have children of the same age (Exhibits "D" and "F"); iii) Plaintiff's mother shared an address with the owner of the Ford driven by the suspect (Exhibits "D" - "E"); and iv) Plaintiff was involved in a motor-vehicle accident shortly before the shooting, aligning with the suspect's possession of the Ford. Exhibits "P".

On the other, neither Ms. Wilson nor Mr. Griffin identified Plaintiff when during the photo line-ups (Exhibits "M" – "N"), the GeoFence cell phone tower search had not yet occurred (Exhibit "Q"), and DNA evidence had not yet been processed (Exhibit "R"). However, the fact that neither Ms. Wilson, nor Mr. Griffin, identified Plaintiff during the photo line-ups mustn't be considered in isolation.

Again, **no** witness questioned during the entirety of the investigation, including Mark and Kris May - the later of whom had been dating the suspect for a decade, could *or were willing* to, give police anything other than a pseudonym for "Truth." Exhibits "B" – "D," "H" – "I," and "O". Coupled with the violent nature of the underlying crime, it is more than a distant possibility that the witnesses feared retaliation if they identified "Truth" to police. While a witness identification may be inadequate to establish probable cause if "there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had

seen, or was in some fashion mistaken regarding his recollection" [*Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)], the inverse is also true. A witness' inability or refusal to identify a suspect does not defeat probable cause if there is reason to question the sincerity of the witness in failing to make an identification and probable cause is established through other means. See, *Stahl v. Czernik*, 496 F. App'x 621, 625 (6th Cir. 2012).[14]

As to whether Det. Thomspon could and/or should have waited for additional evidence to reveal itself before requesting Plaintiff's arrest, an interesting question arises. Typically referenced in the excessive force context, the test for reasonableness under the Fourth Amendment is whether under the totality of the circumstances, the officers' **actions** are objectively reasonable considering the **severity of the crime at issue**, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight. *Graham v. Connor,* 490 U.S. 386, 396-397 (1989) [**emphasis added**]. Courts may also consider whether the suspect is **violent or dangerous** and whether **the suspect may be armed**. *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997) [**emphasis added**]. Although there is scarce precedent that includes the severity of the crime and whether a suspect is violent or armed among

---

[14] Rejecting argument that probable cause would not have existed if the warrant application mentioned a witness' failure to identify Plaintiff. "Had this [] occurred absent any other evidence, [Plaintiff] might have a valid argument."

the totality of circumstances (*in terms of a probable cause assessment*), undersigned counsel found no precedent expressly excluding these concerns either. So:

> *Should a suspect's propensity for murderous behavior, possession of a firearm, and the presence of a child, be considered in evaluating the reasonableness of an officer's probable cause assessment*?

In the absence of guiding precedent, common-sense and parallel analysis suggests this question should be answered in the affirmative.[15] While Det. Thompson may have erred in naming Plaintiff as a suspect, his concern with apprehending the shooter as quickly as possible was certainly justified. "[T]he government has a substantial interest in ensuring the safety of its citizens…" *Johnson v. Morales*, 946 F.3d 911, 923 (6th Cir. 2020). It follows that greater latitude should be afforded when evaluating an officer's probable cause assessment, where the government interests at stake include apprehending an armed, attempted murderer, with a child in their custody. Applied to the facts of this case, the reasonableness of Det. Thompson's probable cause assessment should not ignore the clear and present danger to the public generally, and a young child specifically, that existed as "Truth" remained at large.[16] Plainly stated, the government interests at

---

[15] See, *Graham*, supra [incorporating severity of crime into reasonableness of force assessment]; *United States v. Acevedo,* 627 F.2d 68, 70 (7th Cir.1980) [nature of crime and possession of firearm considered in exigency of circumstances].

[16] Defendants do not suggest that this argument necessarily applies equally to claims arising *after* a suspect's apprehension, at which time the threat posed by the suspect's freedom is mitigated; *e.g.*, Malicious Prosecution.

stake are greater when seeking to apprehend an attempted murderer, as opposed to retail fraud for example, and the reasonableness of an officer's decision to make an arrest, or request a suspect apprehension, should be evaluated accordingly.

When all factors are considered, the issue of whether there was probable cause for Plaintiff's arrest *should* be answered in Defendants' favor, but the issue of the Officers' entitlement to qualified immunity *must* be answered in Defendants' favor. As Judge Sean Cox explained in *Raggs v. Pittsfield Charter Twp.*,[17] citing with approval, Judge Laurie Michelson's Opinion in *McLeod v. Bender*:[18]

> Judge Michelson noted that the 'first layer' of the analysis is the constitutional standard as to what constitutes probable cause and the second layer is the qualified-immunity standard. She explained that **putting the two layers together, the inquiry before the Court becomes more forgiving' to the defendant officers and they are entitled to qualified immunity if they can establish that they had arguable probable cause**, even if a court later determines that they did not have actual probable cause.

> Judge Michelson concluded that **the probable-cause inquiry, standing alone, would be a close call under the facts in that case. But when you consider the ultimate question of whether a reasonable police officer in the same circumstances could have reasonably believed that probable cause existed, it was clear that the officer was entitled to qualified immunity**… *Raggs*, at *5-6 **(emphasis added)** [quotations omitted].

---

[17] 2016 WL 3626807, at *5–7 (E.D. Mich. July 7, 2016) [Exhibit "AA"].

[18] 2015 WL 1470071 (E.D. Mich. Mar. 30, 2015) [Exhibit "BB"].

"Insofar as the question of probable cause here is a close one, reasonable officials could disagree as to whether probable cause existed. Thus, the defendant officers are entitled to qualified immunity on [Plaintiffs] Fourth Amendment seizure claim." *McLeod*, at *11; citing, *Thacker v. City of Columbus*, 328 F.3d 244, 260 (6th Cir. 2003) [internal citation omitted]. As Judge Cox concluded in *Raggs*:

> [**This**] **is the whole point of qualified immunity** – **it protects all but the plainly incompetent and those who knowingly violate the law**. As the Supreme Court has explained, '**it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials —like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable**.' *Raggs*, at *7 (**emphasis added**); quoting *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).

As the absence of probable cause is a necessary element in a false arrest claim and this Honorable Court *should* find that probable cause existed for Plaintiff's arrest, all Defendants are entitled to Summary Judgment. However, if this Honorable Court finds that ultimately, probable cause for the arrest did not exist, it *must* find in favor of Det. Thompson nonetheless, because on the totality of the circumstances, it was objectively reasonable for Det. Thompson to believe sufficient probable cause for Plaintiff's arrest existed.[19]

---

[19] A finding that Det. Thompson's probable cause assessment was objectively reasonable demands Summary Judgement for the remaining Officer Defendants whom, to the extent they had any involvement in Plaintiff's arrest, such involvement was based upon information provided by Det. Thompson.

19

**2)** SHOULD SUMMARY JUDGMENT BE GRANTED IN FAVOR OF DEFENDANTS AS TO COUNT II (SEARCH & SEIZURE) AS TO:

**a. All Defendants, save only Ofc. Carrion, for lack of material personal involvement?**

Incorporating the discussions above, it is undisputed that Ofc. Carrion was the only Defendant that searched Plaintiff (ECF No.: 31, Pg. ID 377, at ¶ 75.  Exhibit "V" beginning at 0:04:50) and aside from a protective pat-down performed by Ofc. Carrion, no search of Ms. Crutchfield's person, home, vehicle, or property, was conducted by any member of FAST, nor Ofc. Yopp or Det. Thompson. Exhibit "U" at Pg. 4, ¶ 17.

As noted above, personal involvement in the alleged constitutional violation is a prerequisite to liability. _Robertson_, supra at 618. "[M]ere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." _Ghandi v. Police Dep't of Detroit,_ 747 F.2d 338, 352 (6th Cir.1984). Thus, while Officer Carrion, who searched Plaintiff (incident to her arrest) _may_ be held liable, the remaining Defendant Officers lack the requisite personal involvement in the search, thus requiring that Summary Judgment be granted in their favor.

Separately, Plaintiff was allegedly fingerprinted and had a DNA sample drawn while at the DDC (ECF No.: 31, at Pg. IDs 378, 381 at ¶¶ 83, 101), which at the time

of Plaintiff's arrest was operated and staffed by the MDOC, rather than DPD.[20] As it is not disputed that no Defendant was involved in the taking of Plaintiff's fingerprints or DNA, Plaintiff cannot demonstrate the requisite material involvement to maintain this claim.

Additionally, it should be emphasized that the thumbprints and DNA were taken **after** the interrogation, by a MDOC employee, as Det. Thompson was working to secure her release from police custody. *Id*. at Pg. ID 381, at ¶¶ 100-101. Therefore, any "causal connection" between the instruction to apprehend Plaintiff and her DNA and thumbprints being taken had ended.

### b. All Defendant Officers as the Search & Seizure of Plaintiff was done incident to a lawful arrest and/or because the Officers are entitled to Qualified Immunity?

Every Defendant Officer in this case believed that there was probable cause for Plaintiff's arrest. An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment. See, *Anderson,* 483 U.S., at 641. This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne,* 526 U.S. 603, 614 (1999). Under the Fourth Amendment, a search absent a warrant is *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz*

---

[20] https://www.michigan.gov/corrections/prisons/detroit-detention-center

*v. United States,* 389 U.S. 347, 357 (1967). One such exception is for searches incident to a lawful arrest. *Chimel v. California,* 395 U.S. 752, 762–63 (1969). When conducting a search incident to arrest, police may search items within the "immediate control" of the person arrested. *Id.* at 763.

In this case, Ofc. Carrion, believing that she and her FAST colleagues were effectuating a lawful arrest, simply patted Plaintiff down for potential weapons or contraband. At no time was Plaintiff's home, cell phone, or vehicle searched. In the interests of brevity, Defendants are unaware of **any** precedent that would out Ofc. Carrion, or any named Defendant, on notice that the brief pat down of Plaintiff prior to placing her in handcuffs was unreasonable.

Similarly, where cell phones have been seized incident to a lawful arrest, or where at a minimum, the arresting officer(s) believed the arrest was lawful, courts have repeatedly held that such seizures are reasonable. See, *United States v. Gholston*, 993 F. Supp. 2d 704, 710, 713–15 (E.D. Mich. 2014) [collecting cases approving warrantless seizures of cell phones incident to lawful arrest]. At the very least, a constitutional right against cell phone seizure incident to arrest is not clearly established, making the officers entitled to qualified immunity. *Black v. City of Royal Oak*, 2024 WL 4220711, at *10 (E.D. Mich. Sept. 17, 2024) [Exhibit "CC"].

Turning to Plaintiff's claim arising out of the seizure of her DNA and fingerprints, the Sixth Circuit has held that the "totality of the circumstances" test

requires "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." _Wilson v. Collins,_ 517 F.3d 421, 425 (6th Cir.2008) [citation and quotation omitted]. Michigan law allows police to obtain DNA without a warrant following a felony arrest, by court order, or if the arrestee consents (see, MCL § 28.176), and challenges to such laws "have been uniformly rejected by the courts, as the government's compelling interests in crime control have consistently been deemed to outweigh the plaintiffs' diminished privacy interests." _Wilson_, supra at 424–25 (citing cases).

In this instance, there was a credible basis to believe that DNA evidence belonging to the AWIM suspect was available on a liquor bottle recovered from the apartment where Mr. Griffin was shot. Exhibit "R". Thus, a legitimate law enforcement purpose existed, and MCL § 28.176 permitted, the taking of Plaintiff's DNA following her arrest, thereby entitling Defendants to Summary Judgment.

**3)** **SHOULD SUMMARY JUDGMENT BE GRANTED IN FAVOR OF DEFENDANTS AS TO COUNT III (ASSAULT & BATTERY) AS TO:**

**a. Det. Thompson & Ofc. Yopp for Absence of Physical Contact?**

If does not appear that Plaintiff is asserting an Assault and Battery claim against Det. Thompson or Ofc. Yopp. Regardless, there is nothing in the pleadings or in the record to suggest that either Officer ever made or threatened Plaintiff with, by, or through physical contact. Accordingly, both are entitled to Summary Judgment.

23

**b.  The FAST Officers, as the Physical Contact used was the minimum amount of force necessary, such that the Officers actions are privileged and they are entitled to Qualified Immunity?**

Turning to the FAST Officers, whatever physical contact was made between any FAST Officer and Plaintiff, was **the absolute minimum** that was necessary to place Plaintiff under arrest. Exhibit "U" at Pgs. 4-5, ¶ 18.  Accordingly, the FAST Officers are entitled to immunity on this claim.

> Each officer [] of a governmental agency [] shall be immune from tort liability [] caused by the officer [] while in the course of employment [] on behalf of a governmental agency if all of the following are met: (a) the officer [] reasonably believes he or she is acting within the scope of his or her authority; (b) the governmental agency is engaged in [] of a governmental function; and (c) the officer's [] conduct does not amount to gross negligence that is the proximate cause of the injury or damage... MCLA § 691.1407(2).

There is no intentional tort exception to governmental immunity. _Smith v. Dept. of Public,_ 428 Mich. 540, 544 (1987). Intentional torts are assessed on the basis of the conduct complained of under the "gross negligence" standard and a government actor is immune as long as he or she reasonably believes that he or she is acting within the scope of his or her authority and the facts do not evidence "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." Here, there is nothing in the record to suggest that the FAST Officers acted outside of the scope of their authority when they arrested Plaintiff, nor can Plaintiff show that the officers' actions were grossly negligent.

A battery occurs when there is a willful, harmful or offensive touching of the plaintiff. _Clarke v. K–Mart Corp.,_ 197 Mich.App. 541 (1992). Assault and battery is the willful touching of the person of another by the aggressor. _Tinkler v. Richter,_ 295 Mich. 396 (1940). A police officer may use reasonable force when making an arrest. _Anderson v. Antal,_ 191 F.3d 451 (6th Cir.1999). The measure of necessary force is that which an ordinary prudent and intelligent person with the knowledge and in the situation of the arresting officer would have deemed necessary. _Id._ Michigan courts have recognized that "[w]hether officers hypothetically could have used less painful, less injurious, or more effective force is executing an arrest is simply not the issue." _People v. Hanna,_ 223 Mich.App. 466 (1997).

In the interests of brevity, there is simply no issue of fact as to whether the force used by the FAST Officers to effectuate Plaintiff's arrest (_if any_) was objectively reasonable. See generally, Exhibits "U" and "V". As such, Defendants are entitled to Summary Judgment on this claim.

**4) SHOULD SUMMARY JUDGMENT BE GRANTED IN FAVOR OF DEFENDANTS AS TO COUNT IV (FALSE LIGHT) AS THERE WAS NO "PUBLIC DISCLOSURE" ASIDE FROM PLAINTIFF'S ARREST?**

An invasion-of-privacy claim protects against four types of invasion of privacy: (1) intrusion upon the plaintiff's seclusion or solitude or into his private affairs;(2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity that places the plaintiff in a false light in the public eye; and (4) appropriation, for the

defendant's advantage, of the plaintiff's name or likeness." _Doe v. Mills_, 212 Mich. App. 73, 80 (1995). Plaintiff's claim is based on the third type: false light. To maintain an action for false-light, Plaintiff must show that Defendant(s) "broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." _Duran v. Detroit News, Inc._, 200 Mich. App. 622, 631-632 (1993). Further, "the defendant must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." _Detroit Free Press, Inc., v. Oakland Co. Sheriff_, 164 Mich. App. 656, 666 (1987).

A false-light claim requires that the plaintiff receive publicity. _Derderian v. Genesys Health Care Sys._, 263 Mich. App. 364, 385 (2004). Publicity can be shown if the defendant "broadcast [the challenged information] to the public in general, or to a large number of people ...." _Duran, at 631-632_. The term "broadcast" means "to make widely known." _Merriam-Webster's Collegiate Dictionary_ (11th ed.). Therefore, dismissal is appropriate when the communication is only published to a small or specific group of individuals. See, _Derderian, at 387_.

In this case, no Defendant "broadcast[ed]" Plaintiff's arrest to anyone, let alone the general public or a large number of people. In fact, the only "broadcasting" of

26

Plaintiff's arrest originated with Plaintiff and her counsel themselves.[21]

Furthermore, there is **zero** evidence that any Defendant knew "or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed."

Defendants are therefore entitled to Summary Judgment on this claim.

5) SHOULD SUMMARY JUDGMENT BE GRANTED IN FAVOR OF DEFENDANTS AS TO COUNT V (FAILURE TO INVESTIGATE & SUPPRESSION OF EVIDENCE) AS THIS CLAIM IS DUPLICATIVE OF PLAINTIFF'S FALSE ARREST CLAIM (COUNT I) AND NO EVIDENCE WAS SUPPRESSED AND NO CHARGES AGAINST PLAINTIFF WERE FILED?

Noting that Plaintiff was never criminally charged, nor was a Warrant Request submitted to the Wayne County Prosecutor's Office, it seems Plaintiff is alleging that Det. Thompson suppressed exculpatory evidence from… himself?

Where "the underlying criminal proceeding terminated in [plaintiff's] favor, he has not been injured by the act of wrongful suppression of exculpatory evidence." _McCune v. City of Grand Rapids_, 842 F.2d 903, 907 (6th Cir. 1988). In such a case, the plaintiff will be seen to have failed to state a claim, although "the wrongful suppression of exculpatory evidence may [still] be relevant to [the plaintiff's] claim of malicious prosecution." _Id_.

---

[21] See _e.g._, https://www.nbcnews.com/news/us-news/detroit-woman-faulty-facial-recognition-technology-arrest-rcna194203

The tort of malicious prosecution is entirely distinct from that of false arrest, as the malicious-prosecution tort remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process. _Wallace v. Kato,_ 549 U.S. 384, 390 (2007). To establish a malicious prosecution claim, plaintiff must prove:

> (1) **a criminal prosecution** was initiated against the plaintiff and the defendant made, influenced, or participated in the **decision to prosecute**; (2) there was no probable cause for the criminal **prosecution**; (3) as a consequence of the legal proceeding, the **plaintiff suffered a deprivation of liberty apart from the initial seizure; and** (4) **the criminal proceeding** was resolved in the plaintiff's favor." _Johnson v. Moseley_, 790 F.3d 649, 654 (6th Cir. 2015) [**emphasis added**].

In other words, no such claim can be made where the Plaintiff was never prosecuted (nor does Plaintiff assert a malicious prosecution claim). Summary Judgment is therefore necessary as to allegations that Det. Thompson suppressed exculpatory evidence.

The balance of this claim is **entirely** duplicative of Plaintiff's False Arrest Claim (Count I), alleging that Plaintiff was arrested without probable cause because Det. Thompson ignored exculpatory evidence and failed to take additional investigatory steps that would have further uncovered exculpatory evidence.

While an alleged failure to investigate can serve as the basis for a § 1983 False Arrest or _Monell_ Claim, and allegations that an officer failed to disclose exculpatory evidence can underly a Malicious Prosecution claim, they are not, on the facts of this case, claims which are distinct from Plaintiff's False Arrest claim.

Finally, the allegations underlying this claim are demonstrable false. Contrary to the allegations stated in the Complaint (ECF No.: 31, Pg. ID 388-390, at ¶¶148-151) Det. Thompson, personally or with assistance from other officers: i) interviewed witnesses to the shooting (Exhibits "A" –" D"); ii) presented photo line-ups to the witnesses (Exhibits "M" – "N"); iii) investigated the aliases "Chew" and "Truth" (Exhibits "G" – "I"); iv) submitted a liquor bottle recovered from the scene of the shooting for DNA testing (Exhibit "R"); v) submitted cell-phone Geofence Warrants (Exhibit "Q"); and vi) obtained surveillance images of the suspect from the area of the shooting, as well as where the Ford was spotted before and after the shooting. Exhibit "G". See also, Case Supplements, collectively Exhibit "DD".

For these reasons, Defendants are entitled to Summary Judgment on this Count.

6) **Should Summary Judgment be Granted in Favor of Defendants as to Count VI (*Monell*) as no Municipal Liability can Attach without an Underlying Constitutional Violation?**

Although the *Monell* and damages stage of Discovery has not yet occurred (ECF No.: 30), should this Honorable Court dismiss the claims brough pursuant to Federal Law against the Defendant Officers [Counts I-II and VII (discussed below)], the City is entitled to Summary Judgment as to Plaintiff's *Monell* claim as well.

The City be held liable for the constitutional violations of its employees only where "the municipality's policy or custom led to the violation" [*Monell v Dept. of Soc. Serv.*, 436 US 658, 694-98 (1978)], and so, "[t]here can be no liability under

*Monell* without an underlying constitutional violation." *Scott v. Clay Cnty.,* 205 F3d 867, 879 (6th Cir 2000); *Los Angeles v. Heller,* 475 US 796, 799 (1986) [*per curiam*].

**7) <u>SHOULD SUMMARY JUDGMENT BE GRANTED IN FAVOR OF DEFENDANTS AS TO COUNT VII (DUTY TO INTERVENE) AS TO:</u>**

The allegations of Count VII (<u>ECF No.: 31, Pg. ID 393, at ¶¶ 162-167</u>), set forth two theories underlying her Duty to Intervene claim: i) that FAST Officers failed to intervene in their arrest of Plaintiff; and ii) Ofc. Yopp failed to intervene during Plaintiff's interrogation.

**a. All Defendant Officers as Probable Cause Existed for Plaintiff's Arrest and/or because the Officers are entitled to Qualified Immunity?**

Turning first to the FAST Officers, if this Honorable Court finds that there was Probable Cause for Plaintiff's arrest, thereby making the arrest lawful, Plaintiff's Duty to Intervene claim fails as a matter of law. *Bonner-Turner v. City of Ecorse,* 627 FedAppx 400, 413 (6th Cir. 2015) [an officer cannot be liable for failing to intervene if there is no constitutional violation].[22]

Furthermore, for the same reasons the FAST Officers should be entitled to Qualified Immunity on Plaintiff's False Arrest claim, they should also be entitled to Qualified Immunity with respect to Plaintiff's Duty to Intervene Claim.

---

[22] The same reasoning applies to the Duty to Intervene claim against Ofc. Yopp.

Because the FAST Officers reasonably believed, correctly or incorrectly, that Probable Cause for Plaintiff's arrest had been established, they were under no duty to intervene and prevent her arrest, even if Det. Thompson was incorrect.

> Under § 1983, an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent. _Everson v. Leis,_ 556 F.3d 484, 499 (6th Cir. 2009) [citations omitted].

"[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful." _Kennedy v. City of Villa Hills, Ky.,_ 635 F.3d 210, 214 (6th Cir. 2011). Accordingly, the FAST Officers are entitled to Qualified Immunity and thus, Summary Judgment.

## b. To Ofc. Yopp, as there was no opportunity to Intervene?

As noted above, Ofc. Yopp was a recent addition to the 9PDU and was still in receiving on the job training, by 'shadowing' other investigators. Exhibit "Y" at Pgs. 1-2, ¶¶ 3-4, 8. When Plaintiff was arrested, Ofc. Yopp's **only** involvement in the investigation was presenting a photo line-up to Mr. Griffin. _Id_. at Pgs. 1-2, ¶ 3; see also, Exhibit "N". In fact, Ofc. Yopp only learned that Det. Thompson had requested that FAST apprehend Plaintiff as she and Det. Thompson were driving to the DDC to interrogate Plaintiff. _Id_. at Pg. 2, ¶¶ 5-6. Additionally, she was not informed of

what additional investigation had occurred, or what evidence had been gathered by Det. Thompson or the other officers that were assisting him that led to Plaintiff's arrest.  *Id.* at Pg. 2, ¶ 6. So again, *at a minimum*, Ofc. Yopp is entitled to qualified immunity on this claim. *Everson*, supra; *Kennedy*, supra.

**8)  SHOULD SUMMARY JUDGMENT BE GRANTED IN FAVOR OF DEFENDANTS AS TO COUNT VIII (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS) AS TO ALL DEFENDANT OFFICERS AS THE OFFICERS' CONDUCT WAS OBJECTIVE REASONABLE, RATHER THAN EXTREME AND OUTRAGEOUS, AND THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY?**

As this Honorable Court should find that the actions of the Defendant Officers in this matter were lawful, Plaintiff's Intentional Infliction of Emotional Distress ("IIED") claim fails as a matter of law. A police officer executing an arrest supported by probable cause does not act in an extreme or outrageous manner. *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004) [holding that because the officer established probable cause to arrest the plaintiff, "as a matter of law he cannot be liable for intentional infliction of emotional distress"]; see also, *Fleming v. Scruggs*, 465 F. Supp. 3d 720, 748 (E.D. Mich. 2020).

Separately, the elements of intentional infliction of emotional distress ("IIED") are (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto-Owners Ins Co.*, 422 Mich. 594, 602 (1985). "The threshold for showing extreme and outrageous conduct is high," and "[n]o cause of action will necessarily lie even where a defendant acts with

32

tortious or even criminal intent." <u>VanVorous v. Burmeister</u>, 262 Mich. App. 467, 481 (2004).  "**[F]ederal courts generally hold that a claim for IIED is made out only where the defendant procured an arrest and ensuing charges knowingly based on false or fabricated evidence**." <u>Akima v. Peca</u>, 652 F. Supp. 3d 848, 864 (E.D. Mich. 2023) [**emphasis added**].

The actions of the Defendant Officers, *even viewed in the most negative light*, fall far from such conduct.  Det. Thompson believed that there was sufficient probable cause for Plaintiff's arrest, the FAST Officers executed the arrest in a highly compassionate and respectful manner,  Ofc. Yopp did not even realize the arrest had taken place, and when Det. Thompson realized that Plaintiff was not the suspect he was looking for, did everything in his power to secure her release as quickly as possible, even offering to drive her home if necessary.[23]

Summary Judgment is inarguably appropriate on these facts.

### MUNICIPAL (*MONELL*) CLAIMS AND RESERVATION

Although there is some ambiguity in terms of what claims are asserted against which Defendants,[24] for purposes of this Motion and based upon the allegations

---

[23] While also producing a letter explaining Plaintiff's non-involvement in the AWIM and ensuring that her fingerprints and DNA was cleared from law enforcement databases.

[24] "Defendants" (Counts I-IV, VIII); "Defendant Thompson" (Count V); "Defendant Detroit" (Count VI); "Defendant Officers" (Count VII).

contained in the Complaint (ECF No.: 31) undersigned counsel has operated under the presumption that: i) Count I (False Arrest & Imprisonment) is alleged against all Defendant Officers; ii) Count II (Search & Seizure) is alleged against all Defendant Officers; iii) Count III (Assault & Battery) is alleged against the FAST Officers only; iv) Count IV (False Light) is alleged against all Defendant Officers; v) Count V (Failure to Investigate & Suppression of Exculpatory Evidence) is alleged against Det. Thompson only; vi) Count VI (*Monell*) is asserted against the City only; vii) Count VII (Failure to Intervene) is alleged against the FAST Officers and Ofc. Yopp, only; and viii) Count VII (IIED) is alleged against all Defendant Officers.

In the event that any of Counts I-V and/or VII-VIII are also being asserted against the City, undersigned counsel requests dismissal of such claims, *sua sponte*, as a plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. *Burgess v. Fischer*, 735 F3d 462, 478 (6th Cir 2013); citing, *Monell*, supra at 694. In other words, to the extent that Plaintiff alleges such claims arose as the result of an unconstitutional custom, policy, practice, or procedure, purportedly subjecting the City to liability pursuant to *Monell*, these claims are subsumed in Count VI of Plaintiff's Complaint, asserting *Monell* liability against the City. Counsel alternatively requests that any count beyond Count VI is asserted against the City, that leave be granted to file a Supplemental Brief more fully addressing these issues.

Separately, to the extent that Plaintiff asserts any claim against the Officer Defendants other than those addressed above, Defendants maintain that there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law. Moreover, the Officers entitled to qualified immunity because there was no constitutional violation, and even if there had been a constitutional violation, it was not a clearly established right. Alternatively, if undersigned counsel misreads what claims are being asserted against which Defendant Officers, Defendants request that leave be granted to file a Supplemental Brief more fully addressing these issues.

## CONCLUSION

**WHEREFORE**, Defendants, respectfully requests that this Honorable Court grant Defendants' Motion for Summary Judgment and further grant any other relief deemed just and appropriate.

Respectfully Submitted,
CITY OF DETROIT LAW DEPARTMENT

Dated: March 3, 2026          /s/   Gregory B. Paddison
                                    Gregory B. Paddison (P75963)
                                    Attorney for Defendants