2015 WL 1470071
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Curtis McLEOD, Plaintiff,
v.
David BENDER and Marcus Mahan, Defendants.

No. 2:13–cv–12878.
|
Signed March 30, 2015.

**Attorneys and Law Firms**

Neal J. Wilensky, Law Office of Neal J. Wilensky, Lansing, MI, for Plaintiff.

Michael J. Guss, Harvey, Kruse, Flint, MI, Crystal B. Olmstead, Flint City Attorney's Office, Flint, MI, for Defendants.

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [53]**

LAURIE J. MICHELSON, District Judge.

*1 While on patrol in 2010, police officer David Bender saw two men who he thought were engaged in or had committed a robbery. The two men were African American, had on blue jeans, and had their white shirts wrapped around their faces such that only their eyes were visible. As Bender approached in his semi-marked police vehicle, the suspects fled. Bender chased. Bender apprehended one suspect, and, as he was securing the suspect, he spotted, from a distance, an individual that he believed was the second suspect. Although Bender could only make out that the individual was an African–American wearing blue jeans and a white t-shirt, he confirmed over his police radio that the individual was the second suspect. This individual was arrested by a responding officer and jailed for well over a year before the state circuit court concluded that there was not even enough evidence to go to trial. The individual was Plaintiff Curtis McLeod. Following his release, McLeod brought this lawsuit asserting, among other things, that Bender lacked probable cause for his arrest and that Defendant Marcus Mahan, who took over the criminal investigation, lacked probable cause to continue his detention.

Before the Court is Defendants Bender and Mahan's motion for summary judgment. (Dkt.53.) The motion was fully briefed and, on March 13, 2015, the Court heard oral argument. Although the Court is very troubled that McLeod spent over a year in prison when, ultimately, there was not even enough evidence to try him, that does not resolve the qualified immunity issue. For the reasons that follow, the Court will GRANT Bender and Mahan's motion.

I.

As McLeod is the party responding to a motion for summary judgment, the Court presents the facts from his perspective and draws all reasonable inferences in his favor. *Loyd v. Saint Joseph Mercy Oakland,* 766 F.3d 580, 588 (6th Cir.2014).

A.

On July 7, 2010, around 12:45 in the afternoon, Flint Police Officer David Bender was looking for a panhandler in the area of South Grand Traverse and West Court Streets in Flint, Michigan. (*See* Bender Dep. at 12, 60.) The area is depicted below. (*See also* Dkt. 59, Pl.'s Am. Resp. to Defs.' Mot. Summ J. Ex. 4, Map of Area.)



Driving towards 322 West Court Street, Bender noticed a white Chrysler Sebring with its doors and trunk open. (Bender

Dep. at 27–28, 63–64.) As Bender approached to about 10 feet, he saw on the other side of the vehicle two shirtless African–American males with white shirts wrapped around their faces such that only their eyes were visible. (Bender Dep. at 13, 14–16, 64.) He also noticed the wooden butt of a gun sticking out of the larger individual's right front pocket. (Pl.'s Am. Resp. Ex. 1, Bender's Police Rep. at 1.)

At that point, the two individuals noticed Bender's cruiser (it was semi-marked as a police vehicle), and took off running to the north through the parking lots and businesses between Grand Traverse and Church streets. (Bender Dep. at 13, 65–66; Bender's Police Rep. at 1.) Bender radioed a possible robbery: "I said two male, blacks. I think I might have gave them a clothing description at that time. I don't recall without having the tapes. But they were running northbound. Blue jeans, white T-shirts, shirts over their faces." (Bender Dep. at 25.) In his police report, Bender described "Sus # 1" as 5′8″, 160 pounds and "Sus # 2" as 5′4″, 140 pounds. (Bender's Police Report at 1.)

**\*2** Bender gave chase in his cruiser. He headed north on Church Street tracking the suspects and then turned left onto West 3rd Street with the suspects having already crossed West 3rd. (Bender Dep. at 21–22, 66–67.) As Bender reached Grand Traverse, he turned north. (*See* Bender Dep. at 22–23, 67.) He then pulled into a parking lot at 617 Grand Traverse believing that the suspects, whom he had lost sight of, were still headed north and, thus, toward him. (Bender Dep. at 23, 69; Bender's Police Rep. at 1.) Bender testified, "I exited my vehicle .... I went to the northeast corner of the building. I looked around the corner and I seen the subject running towards the lot. He jumped a fence into that back parking lot of that apartment building." (Bender Dep. at 23.) In other words, one of the two suspects had come right to where Bender was waiting. (*See* Bender Dep. at 23–24.) Bender, firearm drawn, ordered the suspect to stop, removed the firearm from the suspect's right front pocket, handcuffed the suspect, and began walking him back to his police cruiser. (Bender Dep. at 24, 26; Bender's Police Rep. at 1.) The suspect was later identified as Walter Stephens, i.e., the larger, "Sus # 1" in Bender's report. (Bender's Police Rep. at 1.)

Although about two minutes had passed since Bender had last seen the second suspect (Pl.'s Am. Resp. Ex. 8, Prelim. Exam Tr. at 35), as Bender was securing Stephens, he saw an individual that he believed was the second suspect: "I walked suspect number one over to the ... passenger side of my cruiser and I start to put him in the back. That's when I see the subject matching the description of number two walking [west] on Second Street at Grand Traverse on the southeast corner," (Bender Dep. at 27). According to Bender, the individual was approximately 75 to 100 feet away. (Bender Dep. at 27–28.) McLeod disputes this based on his counsel's reconstruction years later: he says that Bender must have been about 210 feet away. (Pl.'s Am. Resp. at vii, ¶ 28; Pl.'s Am. Resp. Ex. 19, Collett Aff. ¶ 7.) In any event, Bender testified that he could see that the individual at the corner of Grand Traverse and 2nd Street "was thin[,] ... had blue jeans on, white T-shirt, matching the description of who [m] I had seen earlier." (Bender Dep. at 28; *see also id.* at 29.) Bender could also identify the individual as African–American. (Bender's Police Rep. at 1; *see also* Bender Dep. at 29, 39.)

Bender radioed that he had spotted the second suspect and, right about that moment, Flint Police Officer Steve Howe pulled up to the individual. (Bender Dep. at 29–31; *see also* Howe Dep. at 11–13.) According to Howe's police report:

> While en route, I heard [Officer] Bender say there were two [white male] subjects [1] with a gun and mask over their face. One was in custody and one male was running [northbound] on S. Grand Traverse. As I got to S. Grand Traverse at W. Second St. Ofc. Bender said the suspect was walking [westbound] on Second St. I saw a [black male] walking [westbound] on Second St. on the south side of the street wearing a white sleeveless tank top, blue jeans, with a black belt with a tooth type buckle and black tennis shoes. Ofc. Bender advised me this is the subject.

**\*3** (Pl.'s Am. Resp. Ex. 3, Howe's Police Rep. at 1.)

The suspect asked what Howe wanted. (Howe Dep. at 12–13, 24.) At that point, Howe began to exit his vehicle and, in Howe's words, the suspect "bolted." (Howe Dep. at 13.) Howe gave chase with the suspect eventually going between two garages: "And so I ran up to the corner of that garage. And he ran into me and I took him down." (Howe Dep. at

36.) The suspect then asked why Howe had been chasing him. (Howe Dep. at 36–37.) After securing the suspect, Howe received confirmation on his radio from Bender that he had the right person. (Bender Dep. at 34; Howe Dep. at 18–19, 21–22 .) Howe, and Flint Police Officer Harold Dumanois, escorted the suspect to Dumanois' car, searched the area, and then moved the suspect to Howe's vehicle. (Howe's Police Rep. at 1.) Howe transported the suspect to the Flint Police Department. (Howe Dep. at 19; Howe's Police Rep. at 1.)

In his police report, Dumanois provided a description of the suspect similar to Howe's: "[he was] wearing a black baseball hat, white tank top style t-shirt, blue jeans, and black Nike high top basketball shoes. He also was wearing a belt with a large chrome belt buckle with teeth design." (Pl.'s Am. Resp. Ex. 3, Dumanois' Police Rep. at 1.)

The suspect was later identified as McLeod. At his deposition, McLeod explained that, on the day of his arrest, he was walking to his grandmother's house. (McLeod Dep. at 53–54, 57.) As he was walking on 2nd Street he was smoking a "blunt" (marijuana cigarette). (McLeod Dep. at 56–58.) Shortly before Howe arrived, McLeod had put the blunt out and placed it into the ridge of his hat. (McLeod Dep. at 56–58.) McLeod said he ran from Howe because he thought it was possible that there was a warrant out for his arrest (he could not explain why he thought this) and because he had a half blunt in his hat. (McLeod Dep. at 59–60, 119.) McLeod recalled wearing a "wife beater, tank top," "faded lightish blue" jeans, Jordan brand shoes, a black "baseball hat, ... blue jeans, belt buckle with silver teeth on the buckle, a chain from the buckle." (McLeod Dep. at 69–70.) McLeod also had "numerous tattoos down both arms." (Am. Compl. ¶ 30; *see also* Defs.' Mot. at ix ¶ 17; McLeod Dep. at 50–52, 78.) At his deposition, McLeod equivocated as to his height but stated that he weighed about 160 pounds at the time of his arrest:

[MCLEOD:] What is my height? Six—I think like 6–foot two. I mean, I don't know. I don't know. I don't know.

[BENDER'S COUNSEL:] You thought you're 6–foot 2 inches?

A. Yeah, I think.

Q. Can you stand up for a moment? I'm 5′10″, and you're not as tall as I am.

A. 5′6″ then....

Q. What is your weight now?

A. Like 160.

Q. Do you know what your weight was when you were arrested?

A. About the same.

Q. Your best answer about your height is you don't know how tall you are because you never paid attention?

 **\*4**  A. I mean, I'd say about 5′6″. I don't know.

(McLeod Dep. at 68–69.) In his Amended Complaint he asserts that he is about 5′6½″ tall and weighs about 155 pounds. (Am.Compl.¶ 30.)

Bender was not involved in bringing either Stephens or McLeod to the police station. (*See* Bender Dep. at 16.) In fact, Bender never had any further contact with McLeod that night and, apparently, did not see him again until McLeod's preliminary examination. (*See* Bender Dep. at 16, 32, 37–38, 45, 77.)

Instead, Bender returned to the apartments located around 322 West Court Street where he had initially observed the suspects. (Bender Dep. at 35–36.) There, he discovered a flat-screen television in the back of the Sebring. (Bender's Police Rep. at 2.) He asked Stephens which apartment they had been in; Stephens nodded in the direction of the third floor. (*Id.*) Three other officers who had arrived at the scene proceeded to the third floor where they discovered a deceased 54–year–old man with four gun-shot wounds. (*Id.*) Bender eventually went up to the apartment: "It ... appeared that a TV had been forcibly removed .... I exited the apartment and helped secure the area while the homicide unit processed the scene." (Bender's Police Rep. at 2–3.)

B.

Directing that homicide investigation was Defendant Marcus Mahan, then a sergeant in the Flint Police Department's Detective Bureau. (Bender Dep. at 57; Pl.'s Am. Resp. Ex. 12, Mahan Dep. at 10–11 24.) Mahan testified that he and his team went to the scene and "were advised [that] two subjects were in custody. They were both in cruisers[,] separated. I advised the officers to transport them to the station where I would speak to them later." (Mahan Dep. at 20.)

Back at the station, in Mahan's presence, Sergeant David Bigelow tried to interview McLeod. (Mahan Dep. at 21–22.) Although McLeod had signed a form waiving his *Miranda* rights, when Bigelow attempted to question McLeod, "[h]e stated that he didn't want to say anything to us. So he asked for an attorney." (Mahan Dep. at 21.) It appears that McLeod was not questioned. (*See* Mahan Dep. at 21, 32–33.)

Mahan testified that he never asked Bender to view McLeod to verify that he was the person whom Bender had seen:

> [MCLEOD'S COUNSEL:] And my question is, why?
>
> [MAHAN:] Because [Bender] stated that in his report that was the subject he saw run away from the vehicle.
>
> Q. But he already admitted that he didn't see his face.
>
> A. He had his face covered.
>
> Q. So then how are you going to link, other than proximity, how are you going to link McLeod to the crime?
>
> A. Based on his description of McLeod, proximity, time, the time lapse from the time that he put out the description and he ran in the time that he was apprehended, area where he was apprehended, and the fact that Officer Bender must have believed that was him at the time otherwise he would have released him, or had the officers release him.

 **\*5**  (Mahan Dep. at 33–34.)

Mahan was responsible for providing the prosecutor's office with evidence from the crime laboratory. (Mahan Dep. at 39, 44.) As it turned out, a gun-powder test of McLeod's hands was negative, McLeod's fingerprints were not found on the Sebring, and there was no other physical evidence linking McLeod to the homicide. (Mahan Dep. at 24–25; *see also* Bender Dep. at 46–47.) In contrast, it appears that Stephens' prints were found on both the television and the Sebring. (*See* Pl.'s Am. Resp. Ex. 15, Feb. 17, 2012 Hr'g on Mot. to Quash Information at Pg ID 1033–34, 1037.)

Mahan testified, and McLeod does not disagree, that he only had authority to release McLeod "before [the] preliminary exam, within the first seventy-two hours" of McLeod's arrest. (Mahan Dep. at 57; Pl.'s Am. Resp. at vi ¶ 19.) After that, only "the county prosecutor and the judge" had the authority to release McLeod. (Mahan Dep. at 58; *see also id.* at 38–39.) Indeed, two days after McLeod's arrest, on July 9, 2010, the Genesee County Prosecutor's Office authorized, and state district judge signed, an arrest warrant. (Defs.' Reply Ex. A, Mahan Aff. ¶ 6, Ex. 1.) [2]

### C.

Both Bender and Howe testified at McLeod and Stephens' October 14, 2010 preliminary examination. Howe, who actually arrested McLeod, identified Stephens as the person he arrested. (Pl.'s Am. Resp. Ex. 8, Oct. 14, 2010 Prelim. Exam. Hr'g Tr. at 8, 10, 13.) As for Bender, his description of the size of the person that Howe arrested varied upward by two to four inches and by 20 pounds from the description in his police report: "[a]pproximately five six to five eight, 160 pounds, white T-shirt with blue jeans." (Oct. 14, 2010 Prelim. Exam. Hr'g Tr. at 36.) Recognizing "some conflict in testimony between Officer Howe and Officer Bender," the prosecutor asked for, and the court granted, an adjournment of the preliminary examination until November 5, 2010. (Oct. 14, 2010 Prelim. Exam. Hr'g Tr. at 39.)

The preliminary examination did not, however, continue until December 2, 2010. (Dkt. 68, Def. Mahan's Supp. Br. Ex. 2, Dec. 2, 2010 Prelim. Exam Hr'g Tr.) McLeod's then-counsel stressed that McLeod had been identified by a general description: "A white shirt, a young black man in a white shirt on July 7th. There'd have to be dozens of young black men in white shirts in downtown Flint on a July afternoon." (*Id.* at 16–17.) Nonetheless, the district court bound McLeod over: "[T]here is a probable cause linkage, however slight, that would suggest that this case should go to Circuit Court for arraignment for it to be tried on all counts." (*Id.* at 17.)

On March 11, 2011, the state circuit court heard argument on McLeod's motion to quash the Information. (Pl.'s Am. Resp. Ex. 15, Mar. 11, 2011 Mot. to Quash Hr'g Tr. at 1.) At that time, the circuit judge concluded:

> I feel this case needs to go back [to district court] for further testimony. I noted even Mr. Maxwell indicated he didn't have the ballistics yet and that might've been helpful certainly as to Stephens. It is—Mr. McLeod apparently was identified a—the staff indicated by the second officer on the second day [of the preliminary exam], Officer Dumanois, but Howe got it

mixed up and identified Stephens. So the first day of the preliminary exam they didn't have McLeod identified as being one of them and at that point in time they didn't know anything about theft of anything or any homicide whatsoever. And it seems like there's a little—a few missing links, I guess I'll say. And I'll certainly remand it now to [the district judge], if I could have an order, for him to take additional testimony that the People must have by now I hope so they can supplement the record.

**\*6** (Mar. 11, 2011, Mot. to Quash Hr'g Tr. at 7–8.)

The post-remand hearing was not conducted until October 18, 2011—seven months after the circuit court's remand. The state district judge did not alter his prior bind-over decision. (Mahan Aff. ¶¶ 21, 23–24.)

But on November 15, 2011, McLeod was released from jail. (Am.Compl.¶¶ 12, 45.) McLeod says that he was incarcerated for 470 days. (Am.Compl.¶ 12.) [3]

A few months later, and a year-and-half after his arrest, the state circuit court granted McLeod's motion to quash the information. At the February 17, 2012 hearing, the prosecution acknowledged that its case against McLeod was not strong, but urged the court to find probable cause:

> [T]here was no additional evidence against Mr. McLeod ... that was found ... while the case was down in District Court. There was a lot of forensics that came back but none of that did implicate Mr. McLeod any further.

> [McLeod] was at the—in the area at the time the crime was committed. He matched the description of the person that was seen with the co-defendant, Mr. Stephens, at the rear of a vehicle with the TV that was taken from the victim's apartment.

> So ... while we do realize that the evidence is weak in this case, we do feel that there is probable cause and we would object to the motion to quash.

The circuit court disagreed and concluded:

Originally when Officer Howe testified at the preliminary exam back in October of 2010 unfortunately he made an error in [h]is identification of which defendant[,] and kept on identifying the wrong person at the preliminary exam and things didn't get any better later, frankly. And there really wasn't anything else. There wasn't anything else. That was it.

So I still don't have anything. So since I don't have anything else—we didn't have enough last time. We don't have enough today. I'm granting your motion[.]

(Pl.'s Am. Resp. Ex. 15 at Pg ID 1038.)

### D.

In July 2013, McLeod filed this lawsuit.

About two months later, following a ruling on motions to dismiss, McLeod filed an eight-count Amended Complaint against Genesee County Sheriff's Department Deputy John Doe (Count II), Genesee County Assistant Prosecutor Anthony Maxwell (Count III), the City of Flint (Count V), Bender, and Mahan (Counts I, IV, and VIII). (*See generally* Dkt. 26, Am. Compl.) McLeod has since agreed to dismiss Counts VI and VII (Dkt.50), the City of Flint (Dkt.32), and Maxwell (Dkt.40). Deputy Doe has not been identified or served.

As such, only three counts remain for adjudication. In Count I, McLeod alleges that Bender violated his constitutional rights by (1) permitting his continued detainment despite "knowing the whole time that suspect 2 [whom] he initially identified at the crime scene [as standing] 5′4″ and weigh[ing] 140 lbs and that McLeod was larger, weighed more, had tattoos down both arms, a baseball cap and a large chrome belt buckle at the time of the arrest" and (2) "chang[ing] his testimony at the preliminary examination after having a chance to see Curtis McLeod in open court ...." (Am.Compl.¶¶ 60–61.) In Count IV, McLeod alleges that Mahan violated his constitutional rights by continuing to detain him despite knowing that Bender had "never seen suspect number 2's face" and "that the physical description provided by Bender of suspect [number] 2 did not match [McLeod's]." (Am.Compl.¶¶ 79–80.) Notably, although McLeod's Amended Complaint lists the Fourth Amendment's prohibition on "unreasonable searches and seizures," the Fourteenth Amendment's guarantee of substantive due process, and the Fourteenth Amendment's

guarantee of procedural due process (Am.Compl.¶ 51), McLeod fails to specify which, if any, of these constitutional provisions is the basis of Counts I and IV. McLeod is more explicit regarding Count VIII: he asserts a claim of false imprisonment under the Fourth and Fourteenth Amendments of the Constitution against Bender and Mahan. (Am.Compl.¶¶ 100–01.)

**\*7** In July 2014, Bender and Mahan moved for summary judgment on these claims. (Dkt.53.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-movant, here McLeod. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III.

### A.

As Counts I and IV of the Amended Complaint do not specify the provisions of the Constitution that Bender and Mahan allegedly violated, the Court must make that threshold determination before proceeding to the merits.

In his response to Bender and Mahan's motion for summary judgment, McLeod conclusorily states, "Plaintiff Curtis McLeod has asserted constitutional violations of the Fourth, Eighth and Fourteenth Amendment based on the conduct and actions of Defendant Bender and Defendant Mahan." (Pl.'s Am. Resp. at 20.) But he also asserts that the Sixth Circuit's holdings in *McGuire v. City of Royal Oak,* 295 F. App'x 736 (6th Cir.2008), *Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir.2006), and *Yancey v. Carroll Cnty., Ky.,* 876 F.2d 1238 (6th Cir.1989), "apply in this case." (Pl.'s Am. Resp. at 23.) And these three cases, along with *Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir.1999), constitute virtually all of McLeod's legal authority. (*See* Pl.'s Am. Resp. at 15–25.)

Yet these cases, or at least those portions that McLeod apparently relies upon (his brief is not entirely clear), involve the Fourth Amendment. In *Spurlock,* the Court concluded that the plaintiffs' malicious prosecution claim "must be asserted according to the Fourth Amendment." 167 F.3d at 1006 n. 19; *see also id.* at 1001. The portion of *Gregory* upon which McLeod relies (Pl.'s Am. Resp. at 20, 21–22), states that officers cannot reasonably rely on a judicial determination of probable cause where the finding is premised on the officer's own misrepresentations and that "detention of an individual pursuant to such deceptive practices violates the Fourth Amendment." 444 F.3d at 758. *Gregory* relied on *Yancey* for the proposition that "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant," *Yancey,* 876 F.2d at 1243; *see also Gregory,* 444 F.3d at 758, and it appears that this is also how McLeod uses *Yancey* (*see* Pl.'s Am. Resp. at 20). *McGuire* involved a claim that officers violated the Fourth Amendment by fabricating evidence and manufacturing probable cause. 295 F. App'x at 739.

Given that McLeod seems to rely exclusively on Fourth Amendment precedent, the Court concludes that McLeod's claims against Bender and Mahan as alleged in Counts I and IV rest on the Fourth Amendment.

**\*8** It remains, however, that the precise Fourth Amendment claim asserted in Counts I and IV—unlawful arrest or malicious prosecution, for example—is unknown. The Court need not speculate, however, because the viability of the claims intimated by Counts I and IV all turn on the existence of probable cause. *See Wolgast v. Richards,* 389 F. App'x 494, 501 (6th Cir.2010) ("The remaining federal constitutional claims against Richards are the First Amendment retaliatory-prosecution claim and the Fourth Amendment false-imprisonment and unlawful-arrest claims. The presence of probable cause would defeat each of these constitutional claims."); *Sykes v. Anderson,* 625 F.3d 294, 308 (6th Cir.2010) ("The Sixth Circuit recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful

investigation, prosecution, conviction, and incarceration.... To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove the following: ... there was a lack of probable cause for the criminal prosecution." (internal quotation marks omitted)); *Gumble v. Waterford Twp.,* 171 F. App'x 502, 507 (6th Cir.2006) ( " '[T]he existence of probable cause for an arrest totally precludes any section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution, regardless of whether the defendants had malicious motives for arresting the plaintiff.' " (quoting *Gumble v. Waterford Twp.,* 171 F. App'x 502 (6th Cir.2006))); *Gregory v. City of Louisville,* 444 F.3d 725, 749 (6th Cir.2006) ( "[C]ontinued detention without probable cause is an actionable Fourth Amendment injury under § 1983.").

In short, it appears that the gravamen of Counts I, IV, and VIII, the only counts at issue, is that Bender is liable for arresting McLeod without probable cause and that both Bender and Mahan are liable for aiding in McLeod's detainment and prosecution without probable cause. (*See* Pl.'s Am. Resp. at 21–24.)

**B.**

Bender and Mahan disagree. In particular, they say they are qualifiedly immune from suit. (*See* Defs.' Mot. at 15–18.) McLeod's claim that Bender and Mahan lacked probable cause for his arrest, detention, and prosecution, coupled with Bender and Mahan's claim that they are entitled to qualified immunity, results in a two-layered legal standard.

The first layer is the constitutional standard. "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Sykes v. Anderson,* 625 F.3d 294, 306 (6th Cir.2010) (internal quotation marks omitted). The inquiry focuses on "the facts and circumstances within the arresting officer's knowledge" and asks whether they "were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Arnold v. Wilder,* 657 F.3d 353, 363 (6th Cir.2011); *see also Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (providing that the relevant circumstances are determined based on the historical facts relied upon by the officer at the time of the arrest).

**\*9** The second layer is the qualified-immunity standard. Qualified immunity shields government officials from suits for money damages for their reasonable, discretionary actions. *See Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Moldowan v. City of Warren,* 578 F.3d 351, 396 (6th Cir.2009). The analysis is two pronged: (1) has the plaintiff shown that the official violated his constitutional rights? And (2) were those rights clearly established when the official acted? *See Pearson,* 555 U.S. at 232, 236.

Putting the two layers together, the inquiry before the Court becomes more forgiving to Defendants Bender and Mahan: "[i]n an unlawful arrest case in which the defendants raise qualified immunity as a defense, ... [i]f the officers can establish that they had *arguable* probable cause to arrest the plaintiff, then the officers are entitled to qualified immunity, even if a court later determines that they did not actually have probable cause." *Carmichael v. Vill. of Palatine, Ill.,* 605 F.3d 451, 459 (7th Cir.2010) (emphasis added, internal citations and quotation marks omitted); *Peterson v. Kopp,* 754 F.3d 594, 598 (8th Cir.2014) ("To receive qualified immunity ... a police officer need only have 'arguable probable cause' to make the arrest.... Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." (internal quotation marks omitted)); *Brown v. Lyford,* 243 F.3d 185, 190 (5th Cir.2001) ("[T]here must not even 'arguably' be probable cause for the search and arrest for immunity to be lost."). Or, in the words of the Supreme Court, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials ... should not be held personally liable." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Thus, the ultimate question is whether a "reasonable police officer in the same circumstances and with the same knowledge" as Bender and Mahan *"could* have reasonably believed that probable cause existed in light of well-established law." *Carmichael,* 605 F.3d at 459 (internal citations and quotation marks omitted); *accord Fowler v.*

*Burns,* 447 F. App'x 659, 661 (6th Cir.2011) ("In the context of a probable-cause determination, ... an officer is immune from suit unless it was apparent that the circumstances with which the arresting officer was confronted *did not* constitute probable cause. We therefore must consider whether a reasonable officer *could have believed* the arrest was lawful, in light of clearly established law and the information the arresting officers possessed." (second emphasis added, citations and internal quotation marks omitted)); *Nails v. Riggs,* 195 F. App'x 303, 311 (6th Cir.2006) ( "Qualified immunity is warranted when an officer could reasonably believe that probable cause existed to arrest [Plaintiff]."). After taking the historical facts in the light most favorable to McLeod, this ultimate question is one of law for the Court to answer. *See Hunter v. Bryant,* 502 U.S. 224, 227–28, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam) ("The Court of Appeals' confusion is evident from its statement that '[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment ... based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach.' This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial." (citation omitted)); *Everson v. Lets,* 556 F.3d 484, 494 (6th Cir.2009) ("The issue of qualified immunity is essentially a legal question for the court to resolve."); *cf.* *Scott v. Harris,* 550 U.S. 372, 376, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("Qualified immunity is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." (internal quotation marks omitted)).

### C.

**\*10** With this legal standard firmly in mind, the Court turns to McLeod's claims that Bender if liable for his arrest, continued detainment, and prosecution.

Stripping away, for the moment, the qualified-immunity layer, the probable-cause inquiry, standing alone, is close.[4] On the one hand, McLeod highlights facts suggesting the absence of probable cause for his arrest: (1) Bender never saw the suspects' faces (Oct. 14, 2010 Prelim. Exam. Hr'g Tr. at 36); (2) Bender lost track of the second suspect he was chasing for two minutes (*id.* at 35–36); (3) when he confirmed to Howe that Howe had approached the second suspect, Bender was 210 feet away (Bender Dep. at 27–28; Pl.'s Am. Resp. at vii, ¶ 28; Pl.'s Am. Resp. Ex. 19, Collett Aff. ¶ 7);[5] (4) when Howe approached McLeod, McLeod was walking whereas Bender last saw the suspects running and jumping fences (Howe's Police Rep. at 1; Bender Police Rep. at 1); (5) McLeod was wearing his white t-shirt whereas Bender reported that, at the Sebring, the suspects had their shirts wrapped around their faces (Howe's Police Rep. at 1; Bender's Police Rep. at 1) and Stephens did not have his shirt on at the time of his arrest (Bender Dep. at 24); and (6) McLeod had tattoos down his arms and was wearing a baseball hat and a unique belt at the time of his arrest whereas Bender did not recall the second suspect having any of these identifying features despite approaching to within ten feet of him (Howe's Police Rep. at 1; Bender Dep. at 15, 19–20). Additionally, Bender testified that he was concentrating on Stephens at the moment he spotted McLeod at 2nd and Grand Traverse:

> [MCLEOD'S COUNSEL:] You couldn't say he was 5′4, 140? You couldn't say whether he had a baseball cap or not? You couldn't say whether he had tattoos on his arm or not?
>
> [BENDER:] I am concentrating on the suspect I have. I'm putting him in the car. I advised and radioed that suspect number two, or the subject that's number two walking which fits the description of suspect number two, I'm trying to give his location at the same time a cruiser pulls up.

(Bender Dep. at 30.)

On the other hand, Bender was able to discern that the person he directed Howe to arrest was African–American and was wearing blue jeans and a white t-shirt, information which was consistent with his knowledge that the suspects were African–American, wearing blue jeans, and possessed (but were not wearing) white shirts. And it is undisputed that Howe intercepted McLeod northwest of Bender, and that when Bender last saw the suspects, they were headed north. As for the fact that McLeod was walking, Bender testified:

> [BENDER'S COUNSEL:] You have been a police officer for 23 years. You've probably heard stories and taken other reports of other officers involving chases?
>
> [BENDER:] Yes.
>
> Q. You could expect perhaps that [the suspects] would continue running?

A. Yes.

Q. You could expect that perhaps they may turtle and hide somewhere?

**\*11** A. Yes.

Q. And you could expect that they changed their appearance and act nonchalant?

A. Yes.

Q. Is there any set program you thought these gentlem[e]n were going to take?

A. Not at that time, no.

(Bender Dep. at 67–68.) As for McLeod's distinctive belt buckle, Bender testified that when he approached the two suspects at the Sebring, they had their sides facing him so that he would not have seen the buckle. (Bender Dep. at 54.) He also testified that the tattoos may or may not have been visible depending on their size and color. (*Id.*) Notably too, neither Howe's nor Dumanios' report mentions tattoos, despite that both had a much better view of McLeod than Bender. (*See* Pl.'s Am. Resp. Ex. 3.) Perhaps most significantly, Bender testified that while in pursuit of the suspects, the only other pedestrian he saw was a mailman. (Bender Dep. at 73–74; *see also* Pl.'s Am. Resp. at x ¶ 14.) Thus, even though Bender could make out only general features of the person at 2nd and Grand Traverse (African–American, blue jeans, and a white t-shirt), McLeod has no evidence that Bender saw anyone else in the vicinity fitting this general description.[6]

In all, whether there were reasonable grounds to believe that the person Howe arrested was one of the two suspects Bender saw at the Sebring is not easily resolved-as further reflected in the differing opinions of the state court judges who grappled with the issue.

But for precisely this reason Bender is entitled to qualified immunity. In other words, because it is *arguable* that a reasonable officer with Bender's knowledge and in Bender's circumstances would have reasonably believed that McLeod was one of the two suspects who fled from Bender, Bender is qualifiedly immune from suit based on a claim that he lacked probable cause for McLeod's arrest. See *Thacker v. City of Columbus,* 328 F.3d 244, 260 (6th Cir.2003) ( "Insofar as the question of probable cause here is a close one, reasonable officials could disagree as to whether probable cause existed.

Thus, the defendant officers are entitled to qualified immunity on [Plaintiffs] Fourth Amendment seizure claim." (internal citation omitted)); *cf. Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ("Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.").

The cases McLeod relies upon—*Yancey, Spurlock, Gregory,* and *McGuire*—do not require a different result. None would have given a reasonable officer clear notice that there was not probable cause for McLeod's arrest because each is factually different in material ways. See *Ashcroft v. al-Kidd,* ––– U.S. ––––, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." (internal quotation marks omitted)). In *Yancey,* the concern was that a judge might not have issued a warrant had the officer accurately stated to the judge how he learned that the suspect was carrying weapons. See *Yancey,* 876 F.2d at 1244. *Spurlock* involved an alleged conspiracy among officers to fabricate evidence to frame the plaintiff for murder, including coercing someone to testify falsely against the plaintiff. *See* 167 F.3d at 997–1000. Although *Gregory* involved a claim that an officer lacked probable cause to believe that the § 1983 plaintiff was the assailant, the contrary evidence was different than that of this case. The victim whose identification primarily led to the plaintiff's arrest not only described her assailant differently from how the plaintiff looked (for instance, her attacker was described as "clean shaven" but the plaintiff had worn a beard for ten years), the victim also failed to pick the plaintiff out of a photo array and when she ultimately identified the plaintiff as her assailant, it was during a one-on-one show-up as opposed to a lineup. *Gregory,* 444 F.3d at 733, 743 & n. 6. In *McGuire,* the defendants, two off-duty police officers, maintained that they saw the plaintiffs commit an assault, but the countervailing evidence showed that one of the officers had threatened one of the plaintiffs to *tell* him who had committed the assault; additionally, the police-station chaplain testified that one of the officers had expressed doubt that it was the plaintiffs who had committed the assault. *McGuire,* 295 F. App'x at 737–38, 740; *see also McGuire v. City of Royal Oak,*

No. 05–40185, 2006 WL 3741898, at *9 (E.D.Mich. Dec. 15, 2006). The question confronting Bender was whether the identifying features of the individual that he could see from a distance (African–American, blue jeans, white t-shirt) permitted the reasonable inference that the individual was one of the two suspects at the Sebring known to be African–American, wearing blue jeans, and having white t-shirts, when no others matching that general description had been spotted in the area. None of *Yancey, Spurlock, Gregory,* or *McGuire* give a reasonable officer much help in answering that question.

**\*12** Accordingly, the Court concludes that Bender is qualifiedly immune from suit based on McLeod's arrest.

McLeod also asserts that Bender aided in his continued detention without probable cause. It appears that one and perhaps the primary basis for this argument is that when McLeod was at the police station, Bender never went to view McLeod to verify that he was one of the suspects he had seen at the Sebring. (Bender Dep. at 34, 37–38.) But McLeod cites no authority to support his claim that Bender, who believed that the right person had been arrested, had a duty to take actions to exculpate him. See *Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir.1999) ("Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused."). In any event, if, as the Court has concluded, a reasonable officer could have believed that McLeod was one of the two who fled from Bender, a reasonable officer could also believe that McLeod should be detained pending further investigation.

Finally, although McLeod initially sought to hold Bender liable for alleged false testimony at his preliminary examination, he has since conceded that Bender is absolutely immune from a suit based on this theory. (Pl.'s Am. Resp. at 25; *see also* Defs.' Mot. at 19–21.)

Accordingly, the Court will grant summary judgment in favor of Bender on Counts I and VIII of the Amended Complaint.

**D.**

Mahan is entitled to the same result and for similar reasons.

The essence of McLeod's claim against Mahan is that the information available to Mahan demonstrated a lack of probable cause for his detention. (*See* Pl's Resp. at 23–24.)

In particular, McLeod argues that Mahan was able to make personal observations of his appearance and review Howe's and Dumanois' police reports. From this, says McLeod, Mahan knew or should have known that he stood 5′6½″ (Am.Compl.¶ 30) or 5′8″ (Pl.'s Am. Resp. at vi ¶ 17) tall, weighed 155 or 160 pounds, had tattoos down his arms, and was wearing a black hat and a belt with a distinctive buckle at the time of his arrest. In contrast, McLeod notes, Bender's police report, which Mahan also did or should have reviewed, described the second suspect as 5′4″ tall and 140 pounds and did not mention a hat, tattoos, or distinctive belt. Additionally, McLeod points out that none of the forensic evidence, including the results of fingerprint testing, implicated him in the crime. It follows, says McLeod, that a reasonable officer in Mahan's position would not have continued his detention. (*See* Pl.'s Am. Resp. at 24 ("A fabrication was allowed to persist, that is the descriptions Bender gave suspect No. 2 and what Howe observed upon the arrest of McLeod *do not match.* A reasonable police officer does not detain an individual for seventeen months and not attempt to resolve this material discrepancy[.]").)

Before turning to the substance of this argument a more precise framing of the inquiry is necessary. It is undisputed that Mahan only had authority to release McLeod within the first 72 hours of McLeod's arrest. (Mahan Dep. at 57–58.) Thus, Mahan only needed probable cause to detain McLeod for 72 hours. And, because Mahan has asserted qualified immunity, the proper question is whether an objectively reasonable officer with Mahan's knowledge and in Mahan's circumstances *could* have reasonably believed that there was probable cause for detaining McLeod for 72 hours. *See Fowler,* 447 F. App'x at 661; *Carmichael,* 605 F.3d at 459; *Nails,* 195 F. App'x at 311. In other words, Mahan is entitled to qualified immunity if a reasonable officer could find that Mahan reasonably believed that McLeod was involved in the homicide and apparent robbery at 322 West Court Street.

**\*13** A reasonable officer could so find. Although McLeod is correct that Bender's report described the second suspect as smaller, Mahan implied, and a reasonable officer could agree, that the difference was not so great as to rule out McLeod as a suspect: "Q. In this case the differential of 5′4 and 140 pounds, and 5′6[,] ... 160 pounds, did you consider that to be significant? A. No." (Mahan Dep. at 51–52; *see also* Bender Dep. at 75–76 ("Q.... [D]o you know how, why there was a variance [in your testimony at the preliminary exam] in

the height and weight from your initial report? A. Again, it was a general description. It was off a couple inches and 20 pounds at the most.").). See *Valdez v. United States,* No. 1:12–CV–381, 2014 WL 5810279, at \*12 (W.D.Mich. Nov.7, 2014) ("The [Supreme] Court in [*Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) ], held that the mistake was objectively reasonable because the arrestee matched Hill's description (a difference of two inches in height and ten pounds in weight), was in Hill's apartment at the time of arrest, answered Hill's door, and displayed a lack of credibility, such as denying any knowledge of firearms even though a handgun and ammunition clip were in plain view."). And while Mahan knew or should have known that Bender did not document tattoos, a hat, or belt buckle in his report, Mahan could have reasonably inferred that Bender only had a limited opportunity to view both suspects and thus might not have observed these details of the second suspect's appearance. Moreover, Mahan was permitted to rely on the fact that Bender's report stated that he observed, at the intersection of 2nd and Grand Traverse, an individual "fitting the description of the second suspect," i.e., Mahan was permitted to rely on the fact that the only officer who could identify the suspect believed that the correct person had been arrested. As Mahan testified:

> Q. So then how are you going to link, other than proximity, how are you going to link McLeod to the crime?
>
> A. Based on [Bender's] description of McLeod, proximity, time, the time lapse from the time that he put out the description and he ran in the time that he was apprehended, area where he was apprehended, and the fact that Officer Bender must have believed that was him at the time otherwise he would have released him, or had the officers release him.

(Mahan Dep. at 32–33.) *See also S.L. ex rel. K.L. v. Pierce Twp. Bd. of Trustees,* 771 F.3d 956, 961–62 (6th Cir.2014) ("[A]n officer's pre-arrest probable cause determination is sufficient legal authority for the detention of an arrestee pending a judicial probable cause determination. That determination must take place 'promptly,' generally within forty-eight hours."). Mahan was also aware from Howe's report that, when Howe started to get out his car, McLeod fled. *United States v. Moore,* 390 F. App'x 503, 508 (6th Cir.2010) ( " 'Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.' Arguably, the attempt to flee plus the other indications that Defendant could have had drugs might create the necessary probable cause to allow for an arrest and search incident to arrest." (quoting *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000))). Finally, to the extent that McLeod relies on the fact that forensic testing ultimately helped exculpate him, he cites to nothing indicating that this information was available to Mahan within the first 72 hours of his arrest. Although Howe's and Dumanois' police reports provided that McLeod's hands were negative for gunpowder residue, Mahan could have readily concluded that only Stephens, who had been apprehended with a gun, fired the weapon.

**\*14** In short, although there was not strong evidence that the second suspect that Bender pursued was McLeod, there was enough to permit a reasonable officer in Mahan's position to conclude that there was probable cause to detain McLeod for the first 72 hours following his arrest. As such, Mahan is entitled to qualified immunity.

## IV.

It is surely unfortunate that McLeod spent well over a year in prison despite that the prosecutor's office did not have enough evidence to even try him. But the issue before the Court is whether Bender and Mahan had *arguable* probable cause to arrest and detain Mahan. Although the question has no easy answer, for the reasons given, the Court finds they did. The Court thus GRANTS Defendant Bender and Mahan's motion for summary judgment on Counts I, IV, and VIII of the Amended Complaint (Dkt.53). As these are the only remaining counts in the Amended Complaint, the Court will enter a separate judgment.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1470071

## Footnotes

1 Bender testified to mistakenly first radioing that the subjects were Caucasian and then correcting his description to African American. (Bender Dep. at 25.)

2 McLeod has moved for leave to file a sur-reply brief to challenge Mahan's affidavit that Mahan submitted to the Court for the first time in his reply brief. (Dkt.65.) At oral argument, the Court granted McLeod an opportunity to respond to the affidavit. Nothing about the response persuades the Court that its limited reliance on Mahan's affidavit is improper or unfair. (*See* Dkt. 67.) So McLeod's request to strike the affidavit is DENIED. Further, the Court STRIKES two filings by Defendants (Dkts.69, 70) as they are supplemental briefs filed without leave of court. *See* E.D. Mich. LR 7.1(c)(3), (d)(1)(A).

   The Court also notes that the probable cause reviews undertaken by the prosecutor and district judge, as well as any materials relied upon, were not provided as part of the summary judgment record.

3 As the time span between his July 7, 2010 arrest and his November 15, 2011 release is more than 470 days, it is not clear how McLeod calculated the length of his pre-trial detainment. In all events, it is unfortunate that the state bindover proceedings began in October 2010 and yet did not conclude until February 2012.

4 The Court notes that Bender had reasonable suspicion to believe McLeod may have been the second suspect, and therefore to briefly stop him to investigate further. *See generally* *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Bender, however, does not make this argument and seems to concede that he should be treated as an arresting officer and that the question is one of probable cause.

5 Defendants object that McLeod's reconstruction of the events, including that Bender was 210 feet away, lacks foundation. (Defs.' Reply at 2–3.) The Court does not decide the evidentiary issue because even if Bender was 210 feet away, he is still entitled to qualified immunity.

6 McLeod has produced census data and photographs taken in 2014 indicating that the area in which he was arrested was urban and had "high pedestrian traffic." (*See* Pl.'s Am. Resp. Exs. 16–18.) But this does not controvert Bender's testimony that at around 12:45 p.m. on July 7, 2010, he saw no one else in the area other than a mailman.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 12